**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

───────────

**No. 24-1822**

───────────

KAREN LOWY, individually and as parent and next friend of N.T.; ANTONIO HARRIS,

                Plaintiff – Appellants,

        v.

DANIEL DEFENSE, LLC; FAB DEFENSE, INC.; FAB MANUFACTURING & IMPORT OF INDUSTRIAL EQUIPMENT LTD.; BRAVO COMPANY USA, INC.; LOYAL 9 MANUFACTURING, LLC; FOSTECH, INC.; HEARING PROTECTION, LLC; CENTURION ARMS, LLC; MAGPUL INDUSTRIES CORP.; FEDERAL CARTRIDGE COMPANY; VISTA OUTDOOR, INC.; FIOCCHI OF AMERICA, INC.; FIOCCHI MUNIZIONI S.P.A.; SUREFIRE, LLC; TORKMAG, INC.,

                Defendants – Appellees,

        and

STARLINE, INC.; JOHN DOES 1-20,

                Defendants.

------------------------------

EVERYTOWN FOR GUN SAFETY SUPPORT FUND; BRADY CENTER TO PREVENT GUN VIOLENCE; GIFFORDS LAW CENTER TO PREVENT GUN VIOLENCE; GLOBAL ACTION ON GUN VIOLENCE,

                Amici Supporting Appellants,

        and

NATIONAL SHOOTING SPORTS FOUNDATION; NATIONAL RIFLE ASSOCIATION OF AMERICA; SAFARI CLUB INTERNATIONAL; SPORTSMEN'S ALLIANCE FOUNDATION,

Amici Supporting Appellees.

Appeal from the United States District Court for the Eastern District of Virginia, at Alexandria. Claude M. Hilton, Senior District Judge. (1:23-cv-01338-CMH-IDD; 1:23-cv-01501-CMH-IDD)

Argued: October 21, 2025                    Decided: February 11, 2026

Before KING, WYNN, and QUATTLEBAUM, Circuit Judges.

Reversed in part, vacated in part, and remanded by published opinion. Judge King wrote the opinion, in which Judge Wynn joined. Judge Quattlebaum wrote a dissenting opinion.

**ARGUED:** Elizabeth Catherine Lockwood, ALI & LOCKWOOD LLP, Washington, D.C., for Appellants. Brian Wesley Barnes, COOPER & KIRK, PLLC, Washington, D.C., for Appellees. **ON BRIEF:** Kathryn M. Ali, Meghan Palmer, ALI & LOCKWOOD LLP, Washington, D.C.; H. Christopher Boehning, Jacobus J. Schutte, Jenifer N. Hartley, PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP, New York, New York, for Appellants. David H. Thompson, Brian W. Barnes, COOPER & KIRK, PLLC, Washington, D.C., for Appellees Magpul Industries Corp. and SureFire, LLC. V.R. Bohman, Las Vegas, Nevada, Cameron J. Schlagel, SNELL & WILMER, LLP, Costa Mesa, California, for Appellee Daniel Defense, LLC. Jeremy Adelson, Milwaukee, Wisconsin, Alan W. Nicgorski, HANSEN REYNOLDS LLC, Chicago, Illinois; Charles E. James, Jr., Meredith M. Haynes, Richmond, Virginia, Camden R. Webb, WILLIAMS MULLEN, Raleigh, North Carolina, for Appellee Bravo Company USA, Inc. Abram J. Pafford, Jonathan Y. Ellis, MCGUIREWOODS LLP, Washington, D.C.; Harley J. Goldstein, Neha Khandhadia, GOLDSTEIN & MCCLINTOCK, Chicago, Illinois, for Appellees FAB Manufacturing & Import of Industrial Equipment Ltd. And FAB Defense, Inc. Alan D. Bart, REED SMITH LLP, Richmond, Virginia; James B. Vogts, Andrew A. Lothson, SWANSON, MARTIN & BELL, LLP, Chicago, Illinois, for Appellees Vista Outdoor, Inc. and Federal Cartridge Company. Scott L. Braum, Timothy R. Rudd, BRAUM | RUDD, Dayton, Ohio, for Appellees Loyal 9 Manufacturing, LLC; FosTech, Inc.; and Centurion Arms, LLC. David C. Bowen, Forrest M. Via, WILLCOX &

SAVAGE, P.C., Norfolk, Virginia, for Appellees Daniel Defense, LLC; Appellees Loyal 9 Manufacturing, LLC; FosTech, Inc.; and Centurion Arms, LLC. Nicholas P. Vari, Andrew N. Cook, K&L GATES, LLP, Pittsburgh, Pennsylvania, for Appellees Fiocchi of America, Inc. and Fiocchi Munizioni S.p.A. Christopher Renzulli, David A. Jones, RENZULLI LAW FIRM, LLP, White Plains, New York, for Appellees Hearing Protection, LLC and Torkmag, Inc. Keith J. Harrison, Washington, D.C., Neil Nandi, Chicago, Illinois, Anne Li, Ellen M. Halstead, CROWELL & MORING LLP, New York, New York, for Amici Everytown for Gun Safety Support Fund, Brady Center to Prevent Gun Violence, Giffords Law Center to Prevent Gun Violence, and Global Action on Gun Violence. Lawrence G. Keane, Shelby Baird Smith, NATIONAL SHOOTING SPORTS FOUNDATION, INC., Washington, D.C.; Andrew E. Lelling, Boston, Massachusetts, Noel J. Francisco, Anthony J. Dick, Harry S. Graver, Washington, D.C., Zachary Austin, JONES DAY, Columbus, Ohio, for Amicus National Shooting Sports Foundation. Erin M. Erhardt, Joseph G.S. Greenlee, NATIONAL RIFLE ASSOCIATION OF AMERICA – INSTITUTE FOR LEGISLATIVE ACTION, Fairfax, Virginia, for Amicus National Rifle Association of America. Regina Lennox, SAFARI CLUB INTERNATIONAL, Washington, D.C., for Amicus Safari Club International. Michael T. Jean, SPORTSMEN'S ALLIANCE FOUNDATION, Columbus, Ohio, for Amicus Sportsmen's Alliance Foundation.

---

KING, Circuit Judge:

In what has become a far too common and tragic story in our Country, plaintiffs Karen Lowy and Antonio Harris were, among others, brutally maimed and injured in a 2022 shooting that occurred at the Edmund Burke School in Washington, D.C. Ms. Lowy was doing nothing more than picking up her daughter from school. Mr. Harris had just started his afternoon shift as a security guard at the school. From a strategically-positioned "sniper's lair" just across the street and overlooking the Burke School, the Shooter — a 23-year-old man from Fairfax, Virginia — fired approximately 239 times with an AR-15.

In 2023, Lowy — individually and as next friend of her minor child, N.T. — and Harris (collectively, the "plaintiffs") filed lawsuits in the Eastern District of Virginia. By their respective 24-count complaints, they seek to hold several U.S. and foreign-based manufacturers of assault rifles, assault rifle accessories, and ammunition accountable for violations of Virginia's False Advertising Statute and Consumer Protection Act.[1] The plaintiffs also allege that certain defendants committed negligence and negligence per se by violating the National Firearms Act and the Virginia Uniform Machine Gun Act.

---

[1] The relevant named defendants in this appeal are Daniel Defense, LLC ("Daniel Defense"); FOSTECH, Inc. ("FosTecH"); Hearing Protection, LLC ("Griffin Armament"); Loyal 9 Manufacturing, LLC ("SOLGW"); Centurion Arms, LLC ("Centurion Arms"); Bravo Company, USA, Inc. ("BCM"); FAB Defense, Inc. ("FAB Defense"), a subsidiary of FAB Manufacturing and Import of Industrial Equipment, Ltd. ("FAB Manufacturing"); Magpul Industries Corp. ("Magpul"); SureFire, LLC ("SureFire"); Torkmag, Inc. ("Torkmag"); Federal Cartridge Company ("Federal Premium Ammunition"), a subsidiary of Vista Outdoor, Inc.; and Fiocchi of America, Inc. ("Fiocchi"), a subsidiary of Fiocchi Munizioni, S.p.A. Collectively, these entities are referred to herein as "defendants."

4

By its Memorandum Opinion of July 2024, the district court summarily dismissed the plaintiffs' claims against all defendants, pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure. *See Lowy v. Daniel Defense, LLC*, No. 1:23-cv-01338 (E.D. Va. July 24, 2024), ECF No. 242 (the "Dismissal Ruling").[2]  Therein, the court ruled that the plaintiffs could not show a "fairly traceable" connection between their alleged injuries and the alleged misconduct of the defendants, such that they did not possess Article III standing to sue.  Notwithstanding the court's threshold determination that it lacked subject-matter jurisdiction over the plaintiffs' lawsuits, the Dismissal Ruling also concluded — on the merits pursuant to Rule 12(b)(6) — that the plaintiffs' claims are barred by the Protection of Lawful Commerce in Arms Act of 2005, 15 U.S.C. § 7901 *et seq.* (the "PLCAA").

From the Dismissal Ruling, the plaintiffs have appealed.  As explained herein, we are constrained to reject the district court's erroneous Article III standing ruling.  Put simply, the plaintiffs have alleged sufficient facts to demonstrate that their injuries are "fairly traceable" to the defendants' purported misconduct, such that they possess the essential Article III standing to sue. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992).  Otherwise, in this situation, we are obliged to refrain from considering the remaining aspects of the court's Dismissal Ruling — i.e., the court's impermissible and advisory rulings that the plaintiffs' claims are barred by the PLCAA.  Rather, we will

---

[2] Federal Rule of Civil Procedure 12(b)(1) provides, in pertinent part, that "[e]very defense to a claim for relief in any pleading must be asserted in the responsive pleading if one is required.  But a party may assert the following defenses by motion:  (1) lack of subject matter jurisdiction . . . ." *See* Fed. R. Civ. P. 12(b)(1).

5

vacate, set aside, and hold for naught those aspects of the Dismissal Ruling that relate to the PLCAA, and remand for such other and further proceedings as may be appropriate.

## I.

## A.

Friday, April 22, 2022, was supposed to be a normal Spring day for Karen Lowy, her daughter, and also for Antonio Harris.[3] That fateful day was anything but normal — Lowy and Harris were savagely and brutally shot outside the Burke School on Connecticut Avenue in the Northwest area of our Nation's Capital. The Shooter had barricaded himself in a so-called "sniper's lair" apartment just across the street and overlooking the Burke School, armed with an AR-15, various other weapons, and additional equipment.

More specifically, the Shooter's curated arsenal included weapons that had been manufactured by defendants Daniel Defense, FosTecH, Griffin Armament, SOLGW, and Centurion Arms, along with an AR-15-style rifle and "M-Lok" system produced by

---

[3] We accept and recite herein the well-pleaded allegations of the complaints, in the light most favorable to the plaintiffs, as we are obliged to do at this stage in the proceedings. *See, e.g.*, *Lovern v. Edwards*, 190 F.3d 648, 654 (4th Cir. 1999) (recognizing that, for purposes of Rule 12(b)(1), courts must "view[] the alleged facts [in the complaint] in the light most favorable to the plaintiff, similar to an evaluation pursuant to Rule 12(b)(6)").

Furthermore, the allegations set forth in the plaintiffs' respective complaints are virtually identical, excepting background information related to each plaintiff personally and the injuries they sustained during and following the shooting. The facts recited herein are primarily drawn from the complaint in the Lowy case. *See Lowy v. Daniel Defense, Inc.*, No. 1:23-cv-01338 (E.D. Va. Oct. 1, 2023), ECF No. 1 (the "Lowy Complaint").

defendant BCM.[4]   The Shooter's arsenal also included:   (1) a "buttstock" made by defendant FAB Defense; (2) a high-capacity "drum magazine" and grip from defendant Magpul; (3) magazines from defendants Daniel Defense, SureFire, and Torkmag; and (4) ammunition from defendants Federal Premium Ammunition and Fiocchi.[5]



*Crime Scene Photo from Shooter's D.C. Apartment*

*See* Lowy Complaint ¶ 103.

---

[4] A "M-Lok" system is a firearm rail interface system that allows for direct accessory attachment onto the "negative space" mounting points of a firearm, enabling the user (i.e., a shooter) to have a slimmer, lighter, and smoother experience.

[5] A "buttstock" is the stock of a firearm in the rear of the breech mechanism, which provides structural support and a surface for the shooter to brace the firearm against a shoulder for stability and recoil management.  A "drum magazine" is a high-capacity firearm magazine that holds ammunition in a cylindrical, drum-like shape, allowing it to store significantly more rounds than a standard box magazine.

In the days and months leading to the April 2022 shooting, the Shooter had travelled around Northern Virginia building up his stockpile of deadly weapons. Additionally, the Shooter had numerous weapons components and accessories shipped to his Virginia apartment. Once fully assembled, the Shooter transported the assembled arsenal to the apartment overlooking the Burke School from which his assaults occurred. After the shooting spree was completed, the Shooter died by suicide. Following a search by law enforcement, the Shooter's body was found in the lair apartment overlooking the school.

Despite the Shooter firing approximately 239 times that afternoon, Ms. Lowy — who was waiting in her car to pick up her 13-year-old daughter, N.T., from school — and Mr. Harris, a 26-year veteran of the Metropolitan Police Department, miraculously survived the shooting incident. An unresponsive and severely injured Lowy was found by a Secret Service agent, in the street beside her vehicle. Lowy was immediately rushed to the trauma center at Washington Hospital Center, where she was resuscitated twice. Emergency room physicians were forced to cut Lowy's chest open in their trauma bay, performing an emergency thoracotomy as a result of cardiac arrest from the gunshots. The surgeons thereafter found multiple metal fragments (i.e., bullet pieces from defendants Fiocchi and Federal Premium Ammunition products) in Lowy's body. Upon seeing news coverage of the shooting, which included an image of a SWAT team member standing next to Ms. Lowy's car, her husband — named Mr. Jaffe — spent hours trying to find his wife. Jaffe discovered Lowy in the Intensive Care Unit at Washington Hospital Center.

In the aftermath of the Burke School shooting, Lowy attended countless medical appointments and physical and occupational therapy sessions. As a consequence of the shooting, Lowy has been diagnosed with an anoxic brain injury, post-traumatic stress disorder, and major depression. And she continues to require medical care. Meanwhile, Lowy's daughter, N.T., suffers from severe emotional distress caused by the shooting.

For his part, Harris arrived at the Burke School at approximately 3 o'clock in the afternoon on April 22 for his shift as a security guard. Within minutes of Harris's arrival at his workplace, the Shooter opened fire from his "sniper's lair" apartment. Upon hearing shots, Harris promptly yelled for the students to go back inside the school building. In the process, he was shot in the abdomen. Harris sustained immense blood loss, his jaw was shattered when he fell to the ground, and he lost his right kidney and a large portion of his liver. Once the chaos subsided, Harris was also rushed to a local hospital where he underwent various emergency procedures. He spent a week in a medically induced coma, followed by two months in the hospital receiving intensive treatment. To this day, Harris deals with adverse side effects from the shooting and requires substantial medical care.

B.

1.

On October 1, 2023, Ms. Lowy and her daughter, N.T., filed this lawsuit in the Eastern District of Virginia. *See Lowy v. Daniel Defense, Inc.*, No. 1:23-cv-01338 (E.D. Va. Oct. 1, 2023) (the "Lowy case"). Soon thereafter, on November 5, 2023, Mr. Harris filed a nearly-identical lawsuit in the same Virginia federal court. *See Harris v. Daniel*

*Defense, Inc.*, No. 1:23-cv-01501 (E.D. Va. Nov. 5, 2023) (the "Harris case"). By order of December 19, 2023, the district court consolidated the Lowy case with the Harris case.

In their respective 24-count federal court complaints, the plaintiffs each alleged that the defendants had contravened the Commonwealth of Virginia's False Advertising Statute and Consumer Protection Act. And they alleged that certain defendants had committed negligence (that is, defendants Daniel Defense, Magpul, FAB Manufacturing, Fiocchi Munizioni, Surefire, and Torkmag) and negligence per se (i.e., defendants Daniel Defense, BCM, FosTecH, Griffin Armament, Centurion Arms, and SOLGW), by violating the federal National Firearms Act and Virginia's Uniform Machine Gun Act.

More specifically, the plaintiffs alleged that "[t]he mass shooting at Edmund Burke School . . . was the foreseeable and entirely preventable result of a chain of events initiated by" the defendants. *See* Lowy Complaint ¶ 6. According to the plaintiffs:

- "For years, these manufacturers have deceptively and unfairly marketed their assault rifles, rifle accessories, and ammunition in ways designed to appeal to the impulsive, risk-taking tendencies of civilian adolescent and post-adolescent males — the same category of consumers [d]efendants have watched, time after time, commit the type of mass shooting that unfolded again at the Edmund Burke School." *Id.* ¶ 7.

- "The [d]efendants employ sales and marketing practices that create and feed a consumer base of young, civilian men who keep the money rolling in by purchasing not only the rifles, but all the deadly accessories that go with them — ammunition, optics, high-capacity magazines, silencers, and laser-aiming devices, among others. When these consumers foreseeably use Defendants' assault rifles, rifle accessories, and ammunition in mass shootings, the families and communities affected suffer while [d]efendants celebrate boosts to their bottom lines. Defendants know that demand for their weapons, weapon accessories, and ammunition increase in the aftermath of mass shootings. Rather than

10

behave responsibly, [d]efendants stoke fear of gun regulations and encourage stockpiling after shootings to increase that demand." *Id.* ¶ 8.

- "The marketing and sales practices of [d]efendants and other entities within the gun industry — including their practices in the State of Virginia — are the beginning and pivotal links in a foreseeable and predictable chain of events resulting in many mass shootings in America each year. With full knowledge and appreciation of their role in facilitating these mass shootings, [d]efendants continue to intentionally and recklessly advertise, market, promote, and sell a warrior mentality that a certain subset of youths, like this Shooter who live-streamed his crime, fantasize will make them legendary. Defendants have not taken even the simplest steps to prevent or discourage young, impulsive would-be mass shooters from acquiring their weapons, weapon accessories, and ammunition and using them to inflict harm, such as implementing age gates on their social media accounts to align with any state and local regulations governing the age at which a person could purchase or use the relevant products, warning consumers about the dangers of assault rifles, or even avoiding advertising illegal modifications to and uses of weapons. Defendants' practices are negligent and unlawful." *Id.* ¶ 9.

- "After years of conditioning by perverse and pervasive marketing by [d]efendants and the gun industry at large, would-be mass murderers — like the Shooter — naturally look to obtain the products associated with the idolized self-sufficient warrior mentality featured by these promotions." *Id.* ¶ 10 (citation modified).

- "The Shooter purchased a FosTecH Tech-15 rear, manufactured by Defendant FOSTECH, Inc. from a firearms dealer in Fairfax, Virginia on October 2, 2021.  He went to a different dealer, in Alexandria, Virginia, on January 16, 2022, to get Defendant Hearing Protection, LLC's MK1 Griffin Armament lower." *Id.* ¶ 14.

- "While visiting shooting ranges to practice using his guns before the Shooting, the Shooter made additional weapons purchases: he bought a lower receiver made by Defendant Loyal 9 Manufacturing, LLC on November 6, 2021[,] from Silver Eagle Group in Loudon County, Virginia.  And he bought Defendant Centurion Arms, LLC's F-15 receiver on December 16, 2021[,] from Elite Shooting Sports in Prince William County, Virginia." *Id.* ¶ 15 (citation modified).

11

- "The Shooter also bought [d]efendant[s] Daniel Defense, LLC's DDM4 V7 rifle, the exact same AR-15 rifle that was used by another violent young man just over a month later to conduct a mass shooting at Robb Elementary in Uvalde, Texas — and Daniel Defense's DD magazine, a high-capacity, 32-round magazine that is designed for fast and secure reloads." *Id.* ¶ 16 (citation modified).

- Each [d]efendant enabled the Shooter to carry out the Shooting. They knowingly sought to place their weapons, accessories, and ammunition in the hands of disturbed young men by targeting and exploiting the risk-seeking . . . desires of these consumers. The Shooter and other would-be mass shooters are highly susceptible to disturbing promotional messages, which foreseeably feed the desires of these young men to act out their militaristic fantasies on a civilian population." *Id.* ¶ 43.

Furthermore, the complaints alleged that the defendants engaged in intentional, unfair, and deceptive conduct in marketing their products to civilians — including marketing to "teens and young adults" — "[d]espite knowing that mass shootings have been repeatedly perpetrated by young men armed with assault rifles[.]" *See* Lowy Complaint ¶ 53 (further alleging that "[d]efendants specifically and intentionally market their weapons, weapon accessories, and ammunition in ways that appeal to adolescent and post-adolescent males, including through social media and invocations of other brands geared toward children and young adults. They have taken no steps to guard against the sale of their weapons, weapon accessories, and ammunition to those who would foreseeably commit such violent acts and, in some cases, have even gone so far as to ridicule the idea that their advertising should not promote and encourage violence."). According to the complaints, "[t]hese advertisements are especially salient for — and are targeted to attract — troubled young men attracted to violent combat, increasing the risk

12

that these young men will use [d]efendants' deadly weapons, weapon accessories, and ammunition to perpetrate mass violence." *Id.* ¶ 55 (citation modified).

The complaints also identified various specific advertisements by the defendants aimed at attracting civilian consumers to engage in violent combat. *See* Lowy Complaint ¶ 57-93 (factual allegations identifying defendants' advertisements). Additionally, the complaints averred that some of the defendants' advertisements "promote activity that is or may be illegal." *Id.* ¶ 94 ("Despite some content moderation on social media sites, [d]efendants Daniel Defense, BCM, SOLGW, and others have been undeterred from advertising their products in connection with activity that is or may be illegal in some or all jurisdictions — without any regard to where the consumer is viewing the ad from. This content, too, appeals to the thrill-seeking impulses of young men like the Shooter. In fact, the Shooter used [d]efendants' weapons just as they encouraged him to in their marketing — targeting Ms. Lowy's car with a scope, and riddling it with as many bullet holes as he could."). That is, "[d]efendants knew or should have known of the risks of their deceptive marketing and related conduct, as the growing numbers of mass shootings involving assault rifles each year repeatedly and consistently show." *Id.* ¶ 104; *id.* ¶ 106 ("Defendants' deceptive marketing targets and exploits this demographic by promoting advertising that is specifically appealing to — and encouraging of — this group's propensities for violent behavior. The Shooter who terrorized the Edmund Burke School was 23 years old.").

On that score, although not exhaustive of the defendants' alleged advertisements and marketing, the following are representative samples drawn from the Lowy Complaint:

13



*Daniel Defense Instagram Advertisement (June 25, 2021)*



*FAB Instagram Advertisement (January 13, 2022)*

14



*Fiocchi Instagram Advertisement (July 1, 2021)*



*BCM Instagram Advertisement (June 25, 2018)*

15



*Daniel Defense Instagram Advertisement (March 2, 2022)*



*BCM Instagram Advertisement (July 30, 2019)*

*See* Lowy Complaint ¶¶ 60, 62, 63, 81, 95, 96.

16

The complaints also provided the district court with detailed factual allegations related to the Shooter. That included, inter alia, specific allegations regarding the Shooter's background and motivations for carrying out the April 2022 shooting at the Burke School:

- "Upon information and belief, the United States Coast Guard discharged the Shooter because it learned of attributes that made him unfit for military service." *See* Lowy Complaint ¶ 107.

- "In the months leading up to the Shooting, the Shooter purchased more than 15 firearms or firearm accessories and amassed thousands of rounds of ammunition. At just his D.C. apartment crime scene, the Shooter had approximately 1,000 rounds of ammunition." *Id.* ¶ 108.

- "The Shooter used [his] Wikipedia account identifying him as 'an AR-15 aficionado' to update the page for the Edmund Burke School as police searched for him. He wrote: 'A gunman shot at the school on April 22, 2022. The suspect is still at large.' As police continued to search for [the Shooter] hours after he had posted about the Shooting online under his own name, the Shooter posted again: 'Your taxes pay for these incompetent fools.'" *Id.* ¶ 118 (citation modified).

- "Just as [d]efendant Starline Brass told him through its advertising, the Shooter's stockpile of weapons, weapon accessories, and ammunition had made him feel powerful — powerful enough to livestream his crime and taunt police under his own name." *Id.* ¶ 119 (citation modified).

- "Though he owned numerous other weapons, weapon accessories, and boxes of ammunition, [d]efendants' products were his weapons, weapon accessories, and ammunition of choice. Upon information and belief, the Shooter made these choices because he perceived these weapons, accessories, and ammunition to be a superior fit for carrying out his mission of causing the most destruction possible." *Id.* ¶ 120.

- "Upon information and belief, the Shooter assembled [d]efendants' products to create customized weapons of war for use in the Shooting. The Shooter's online presence suggests that he did so after searching online for how-to instructions and instructional videos." *Id.* ¶ 121.

17

- "The Shooter also purchased various weapons, weapon accessories, and ammunition online from a number of retailers, exposing [him] to [d]efendants' products and advertisements[.]" *Id.* ¶ 122.

- "Upon information and belief, the Shooter was exposed to and influenced by [d]efendants' deceptive and unfair marketing acts and practices while researching and planning the Shooting." *Id.* ¶ 123.

- "Defendants' deceptive and unfair marketing acts and practices increased the level of violence of the Edmund Burke Shooting by putting in the Shooter's hands deadly weapons, accessories, and ammunition that he thought were together designed for mass death." *Id.* ¶ 124.

2.

In late 2023, the U.S.-based defendants each moved to dismiss the Lowy case on various grounds, primarily maintaining that Ms. Lowy and her daughter, N.T., did not possess constitutionally mandated Article III standing to sue in federal court. Ms. Lowy and N.T. thereupon moved for leave to file an omnibus opposition to the defendants' motions in the Lowy case, which the district court denied in favor of defendant-by-defendant dismissal briefing. On January 11, 2024, however, the court granted the parties' joint motion — excepting defendants FAB Manufacturing and Fiocchi Munizioni — requesting that the dismissal briefing in the Lowy also apply to the Harris case.[6]

---

[6] We observe that defendant FAB Manufacturing was deemed by the Clerk of Court to be in default in the Lowy case on February 21, 2024, and in the Harris case on March 25, 2024. By order of April 12, 2024, a magistrate judge granted FAB Manufacturing's request to set aside the default in the Lowy case. And by separate order of May 13, 2024, the magistrate judge granted FAB Manufacturing's request to set aside the default in the Harris case. On appeal, the plaintiffs do not challenge those default relief rulings.

18

After initially scheduling a hearing on the defendants' motions to dismiss for January 19, 2024, the district court cancelled that proceeding two days beforehand. Six months later, on July 24, 2024, the court dismissed the plaintiffs' respective claims in the complaints against all defendants on the papers. By its 11-page Dismissal Ruling, the court initially concluded that, for purposes of Article III standing to sue in federal court, the plaintiffs could only satisfy the "causation requirement" of Article III "if the defendant's conduct had a determinative or coercive effect upon the action[s] of" the Shooter. *See* Dismissal Ruling 4. In that respect, the court related as follows:

> [A] third party bridges the alleged causal chain between defendants' conduct and plaintiffs' injuries. At the beginning of the alleged causal chain, defendants marketed their weapons and weapons accessories to potential consumers in Virginia. At the end, Shooter injured plaintiffs by firing at an elementary [sic] school. This chain relies on Shooter, a third party not before the Court, to link defendants to plaintiffs' injuries. Accordingly, to establish standing against defendants, plaintiffs must allege that defendants' conduct had a determinative or coercive effect upon Shooter's actions.

*Id.*[7]

In this light, the district court reasoned that "[m]uch of plaintiffs' complaint[s] concern[] defendants' marketing to Virginia residents generally and 'young men like the Shooter' . . . but few paragraphs allege the effect of defendants' marketing on Shooter specifically." *See* Dismissal Ruling 4. According to the Dismissal Ruling, however, the complaints "fail[ed]" to satisfy Article III's causation requirement for two reasons:

---

[7] The Dismissal Ruling repeatedly refers to the Burke School as an "elementary school." *See, e.g.*, Dismissal Ruling 4, 6. We observe, however, that the Burke School is actually an independent college preparatory school for grades 6 through 12.

First, concerning Shooter's reliance on defendants' marketing, plaintiffs' allegations are conclusory. Generally, a plaintiff may plead "based on 'information and belief if such plaintiff is in a position of uncertainty because the necessary evidence is controlled by the defendant." *Ridenour v. Multi-Color Corp.*, 147 F. Supp. 3d 452, 456 (E.D. Va. 2015). But, like all other allegations, allegations pled upon information and belief "may not be wholly conclusory." *Kashdan v. George Mason Univ.*, 70 F.4th 694, 701 (4th Cir. 2023). If "not supported by any well-pled facts that exist independent of [plaintiffs'] legal conclusions," allegations pled upon information and belief fail. *Id.* Such is the case here: no factual allegations in the complaint support the conclusion that Shooter relied on defendants' marketing. The complaint does not suggest defendants control such evidence of Shooter's reliance and does no more than speculate that Shooter, like other young men in Virginia, observed defendants' advertisements. Without more support, these pleadings fail to raise plaintiffs' right to relief above the speculative level and can proceed no further. *Lokhova v. Halper*, 995 F.3d 134, 148 (4th Cir. 2021) ("It is well established that speculative conclusions are insufficient to survive a motion to dismiss.").

Second, viewed most optimistically, plaintiffs allege that Shooter relied on defendants' advertisements when choosing to purchase defendants' products. The Court cannot transform that allegation into an allegation that defendants' marketing had a "determinative or coercive effect" on Shooters' decision to shoot at plaintiffs. While the bounds of Article III's causation requirement may at times seem opaque, "[c]ausation makes its most useful contribution to standing analysis in circumstances that show a clear break in the causal chain." 13A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 3531.5 (3d ed. 2024). Here, the actions of a third party injured plaintiffs. As explained above, completing the causal chain requires plaintiffs to allege defendants' conduct had a determinative or coercive effect on that third party's injurious actions. This complaint, however, fails to make that allegation. *Maybe* defendants' advertising coerced Shooter to *purchase* defendants' products (and that allegation, as discussed above, is speculative), but absent is any allegation that defendants' advertising coerced Shooter to attack the elementary [sic] school. Without that allegation, plaintiffs' alleged causal chain is incomplete, and [they] lack standing against these defendants.

*Id.* at 5-6.

20

Notwithstanding the Dismissal Ruling's threshold jurisdictional determinations — i.e., that the plaintiffs lacked Article III standing to sue in federal court on account of the fact that the complaints failed to establish that the plaintiffs' gruesome and horrendous injuries were "fairly traceable" to the defendants' alleged misconduct — the district court then also ruled that the PLCAA served as a bar to each of the claims alleged against the defendants. On that basis, the court dismissed each of the plaintiffs' claims on their merits against all defendants, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.[8]

\* \* \*

On August 22, 2024, the plaintiffs timely noticed this appeal from the Dismissal Ruling. And we possess final decision jurisdiction pursuant to 28 U.S.C. § 1291.[9]

---

[8] We also observe that, on its own initiative, the Dismissal Ruling surprisingly dismissed three defendants on PLCAA grounds, even though they had not moved for such relief. Otherwise, in the Harris case, the court dismissed the previously defaulted defendant — FAB Manufacturing — without that defendant even seeking such relief.

[9] The defendants advance a rather fleeting and undeveloped argument that this Court lacks appellate jurisdiction under § 1291, asserting that the complaints each named unknown "John Doe" defendants. *See* Br. of Appellees 2. As the defendants acknowledge in their responsive submissions, however, the plaintiffs have agreed to dismiss the Doe defendants and have not otherwise appealed those dismissals. Accordingly, as observed above, we possess jurisdiction in this appeal, pursuant to 28 U.S.C. § 1291. *See, e.g.*, *Koehler v. Dodwell*, 152 F.3d 304, 308 (4th Cir. 1998) (recognizing well-settled rule that "a [dispensable] party . . . whose presence deprives the court of jurisdiction may be dropped or severed from the action" to preserve jurisdiction); *Caperton v. Beatrice Pocahontas Coal Co.*, 585 F.2d 683, 691-92 (4th Cir. 1978) (same).

II.

"We review de novo a district court's dismissal of a complaint for want of Article III standing to sue — and thus for lack of subject matter jurisdiction — under Federal Rule of Civil Procedure 12(b)(1)." *See Ali v. Hogan*, 26 F.4th 587, 595 (4th Cir. 2022). To that end, when — as is the case here — a defendant makes a facial challenge to subject matter jurisdiction, "the plaintiff, in effect, is afforded the same procedural protection as he would receive under a Rule 12(b)(6) consideration." *See Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982). Under that standard, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation modified).

Importantly, as our Court has recognized, plaintiffs are not required "to prove [their] case in the complaint." *See Robertson v. Sea Pines Real Est. Cos., Inc.*, 679 F.3d 278, 291 (4th Cir. 2012) (recognizing that "[t]he requirement of nonconclusory factual detail at the pleading stage is tempered by the recognition that a plaintiff may only have so much information at [her] disposal at the outset"). Furthermore, Rule 12(b)(6) "does not countenance . . . dismissal based on a judge's disbelief of a complaint's factual allegations." *See Neitzke v. Williams*, 490 U.S. 319, 327 (1989). Indeed, it is "error" for a district judge to give "a serious claim the back of its hand" because it does not believe the plaintiff's allegations. *See Colon Health Ctrs. of Am., LLC v. Hazel*, 733 F.3d 535, 545 (4th Cir. 2013). Rather, the federal courts are obliged to "accept as true all well-pleaded allegations

22

and . . . view the complaint in the light most favorable to the plaintiff." *See Mylan Lab'ys, Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993).

III.

The first issue we address is whether the plaintiffs possess Article III standing to sue in federal court. More specifically, that question is whether the plaintiffs' factual allegations establish that their gruesome injuries from the alleged shootings are "fairly traceable" to the defendants' purported misconduct. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). By its Dismissal Ruling, the district court concluded that the plaintiffs lack Article III standing to sue. That ruling is erroneous, however, and warrants a reversal. Put simply, the plaintiffs possess Article III standing to sue in federal court.

Furthermore, in these circumstances, we are obliged to refrain from considering any other aspects of the Dismissal Ruling — that is, the advisory rulings that the plaintiffs' claims against all defendants are barred on the merits by the PLCAA. Instead, we vacate, set aside, and hold for naught the advisory aspects of the Dismissal Ruling pertaining to the PLCAA. And we remand for such other and further proceedings as may be appropriate.

A.

1.

"Article III of the Constitution requires a litigant to possess standing to sue in order for a lawsuit to proceed in federal court." *See Ali v. Hogan*, 26 F.4th 587, 595 (4th Cir. 2022); *Benham v. City of Charlotte*, 635 F.3d 129, 134 (4th Cir. 2011) (explaining that

23

"[s]tanding to sue is one aspect of the mandate that an action must present a 'case or controversy' under Article III").  Standing to sue has been described by the Supreme Court as the "irreducible constitutional minimum" that must be satisfied in all federal cases. *See Lujan*, 504 U.S. at 560.  As the Court emphasized recently, "[b]y limiting who can sue, the standing requirement implements 'the Framers' concept of the proper — and properly limited — role of the courts in a democratic society." *See Diamond Alt. Energy, LLC v. Env't Prot. Agency*, 606 U.S. 100, 111 (2025) (citation modified).  Indeed, "[s]tanding doctrine also tends to assure that the legal questions presented to the court will be resolved, not in the rarified atmosphere of a debating society, but in a concrete factual context conducive to a realistic appreciation of the consequences of judicial action." *Id.*

To that end, in its 1992 *Lujan* decision, the Supreme Court outlined the three requirements that a plaintiff must establish in order to possess Article III standing: (1) "an injury in fact" that is "concrete and particularized"; (2) "a causal connection between the injury and the conduct complained of," such that the injury is "fairly traceable to the challenged action of the defendant"; and (3) a likelihood that the injury will be "redressed by a favorable decision." *See* 504 U.S. at 560-61 (citation modified).  Ultimately, it is the plaintiff who bears the burden of establishing Article III standing to sue in federal court "at the time he filed suit." *See Carney v. Adams*, 592 U.S. 53, 59 (2020); *Friends of the Earth, Inc.* v. *Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 191 (2000).

Of especial relevance here, "[a]t the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we

24

presume that general allegations embrace those specific facts that are necessary to support the claim." *See Lujan*, 504 U.S. at 561 (citation modified). In that regard, although a plaintiff is required to allege "nonconclusory factual details" in the complaint, our Court has recognized that this requirement is "tempered by the recognition that a plaintiff may only have so much information at [his or her] disposal at the outset" of litigation. *See Robertson v. Sea Pines Real Est. Cos., Inc.*, 679 F.3d 278, 291 (4th Cir. 2012).

Moreover, a federal court is obliged to analyze the issue of Article III standing "differently depending on the stage of the litigation at which the challenge is brought and the substance of the defendant's arguments." *See Overbey v. Mayor of Balt.*, 930 F.3d 215, 227 (4th Cir. 2019); *Wikimedia Found. v. Nat'l Sec. Agency*, 857 F.3d 193, 212 (4th Cir. 2017). At the motion to dismiss stage, the Supreme Court has characterized the *Lujan* standing requirements as being "relatively modest." *See Bennett v. Spear*, 520 U.S. 154, 171 (1997). And that is particularly so as it relates to traceability. *See DiCocco v. Garland*, 52 F.4th 588, 592 (4th Cir. 2022) (recognizing that "[a]t the motion-to-dismiss stage, [the traceability] burden is relatively modest . . . and lower than the causation showing required to prevail in a tort suit"); *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 128 n.4 (2014) ("Proximate causation is not a requirement of Article III standing[.]").

2.

Against this backdrop of constitutional standing principles, the parties do not dispute the proposition that the plaintiffs satisfy both the first and the third of the *Lujan* elements. And in that regard, the district court did not even address those two elements in

25

its Dismissal Ruling. Based upon our independent review of the respective factual allegations in the complaints, however, we are entirely satisfied that both of those *Lujan* elements are established here. *See, e.g.*, *Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009) (recognizing that federal courts have "an independent obligation to assure that [Article III] standing exists, regardless of whether it is challenged by any of the parties").

Put succinctly, our focus in this situation is properly on the second *Lujan* element: whether the allegations in the complaints have established "a causal connection between the injury and the conduct complained of," such that the injury is "fairly traceable" to the defendant's actions. *See* 504 U.S. at 560. Again, the plaintiffs' burden of proof as to that *Lujan* element is "relatively modest" at the "motion-to-dismiss stage." *See DiCocco*, 52 F.4th at 592; *Bennett*, 520 U.S. at 171. The Dismissal Ruling is that the complaints failed to satisfy that *Lujan* element, such that the plaintiffs lack Article III standing to sue in federal court. As explained in further detail below, we are constrained to disagree.

a.

In assessing the second *Lujan* element, the district court anchored its faulty analysis on the question of whether the "plaintiffs . . . allege[d] that defendants' conduct had a determinative or coercive effect upon Shooter's actions." *See* Dismissal Ruling 4. In other words, the court incorrectly believed that the plaintiffs could satisfy the second *Lujan* element (i.e., Article III causation) only if they had demonstrated that the defendants' conduct had a "determinative or coercive effect" on the actions of the Shooter. *Id.*

26

Put simply, the Supreme Court has disavowed the more stringent and exclusive approach espoused by the district court. To be sure, although the Court has cautioned that standing "is ordinarily substantially more difficult to establish" in a case "where a causal relation between injury and challenged action depends upon the decision of an independent third party," it is not impossible to establish. *See California v. Texas*, 593 U.S. 659, 675 (2021) (citation modified). Rather, as the Court has recognized, if the plaintiffs can "show at least that third parties [i.e., the Shooter] . . . likely react[ed] in predictable ways," then the second *Lujan* element — i.e., the causation requirement — will be satisfied. *Id.*; *see also Dep't of Com. v. New York*, 588 U.S. 752, 768 (2019) (ruling that Article III causation is satisfied where plaintiffs' theory relied on "predictable effect" of defendants' actions on third parties). In this light, the second *Lujan* element will be satisfied if the plaintiffs allege that the defendants' actions had a "predictable effect . . . on the decisions of third parties," *see Dep't of Com.*, 588 U.S. at 768, or when the "injury [was] produced by determinative or coercive effect upon the action of someone else," *see Bennett*, 520 U.S. at 169.

The foregoing makes sense in light of the Supreme Court's recognition that Article III standing "requires no more than *de facto* causality," *see Dep't of Com.*, 588 U.S. at 768 (quoting *Block v. Meese*, 793 F.2d 1303, 1309 (D.C. Cir. 1986) (Scalia, J.)), along with our Court's recognition that the Article III causation burden is "relatively modest," especially at the "motion-to-dismiss stage," *see DiCocco*, 52 F.4th at 592. To that end, although a "highly attenuated chain of possibilities" will not support a theory of Article III standing, *see Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013), when there is "a causal

27

connection between the injury and the conduct complained of," *see Dep't of Educ. v. Brown*, 600 U.S. 551, 561 (2023), the second *Lujan* element has been satisfied.

Along these lines, we also disagree with the district court and the defendants that the Supreme Court's 1997 decision in *Bennett* announced an exclusive test for ascertaining whether the second *Lujan* element has been satisfied. Put simply, if *Bennett* had announced an exclusive test, then the *Department of Commerce* decision in 2019 modified it. *See* 588 U.S. at 768 (applying "predictable effect" test to ascertain whether plaintiff had satisfied second *Lujan* element).[10] Otherwise, as discussed *infra*, we are satisfied that, if *Bennett* announced an exclusive test for cases such as this, the allegations of the complaints show that the defendants' actions had a "determinative or coercive effect" on the Shooter.

---

[10] The defendants' argument that the Court's *Department of Commerce* decision limits application of the "predictable effects" test only to pre-enforcement challenges is unpersuasive and underdeveloped. *See* Br. of Appellees 15-16. Indeed, at least one of our sister circuits — the Second Circuit — has recently concluded that an application of the "determinative or coercive effect" standard "overstates the showing that is required" for Article III standing, which can otherwise be based on "predictable effect[s]." *See Ateres Bais Yaakov Acad. of Rockland v. Town of Clarkstown*, 88 F.4th 344, 352 (2d Cir. 2023) (relying on 2019 *Department of Commerce* decision and concluding that Article III causation requirement is satisfied when plaintiff alleges that defendant's conduct and actions had "[a] predictable effect . . . on the decisions of third parties" (citation modified)).

Furthermore, to the extent the defendants — along with our fine dissenting colleague Judge Quattlebaum, *see post* at 52-54 — seek to rely on our recent 2025 decision in *Sheppheard v. Morrisey*, 143 F.4th 232 (4th Cir. 2025), that ruling does not mention — let alone address — the Supreme Court's 2019 decision in *Department of Commerce*. Nor could *Sheppheard* "read in" a requirement that Article III standing is "*only*" established "if the defendant's conduct had a determinative or coercive effect upon the action of someone else." *Id.* at 243 (quoting *Bennett*, 520 U.S. at 169) (emphasis added). To be sure, although *Bennett* recognized that an "injury produced by determinative or coercive effect upon the action of someone else" is sufficient to satisfy Article III's causation requirement, that decision did not conclude that is the exclusive test. *See* 520 U.S. at 169.

28

b.

In light of the foregoing, we agree with the plaintiffs that the complaints have demonstrated that the defendants' actions were "at least in part responsible for" causing the plaintiffs' injuries, and that the defendants' conduct had a "predictable effect" on the actions of the Shooter. *See Dep't of Com.*, 588 U.S. at 768; *accord Ateres Bais Yaakov Acad. of Rockland v. Town of Clarkstown*, 88 F.4th 344, 352 (2d Cir. 2023) (concluding that plaintiff possessed Article III standing to sue where defendants' actions to frustrate plaintiff's acquisition of property had "[a] predictable effect on the decisions of relevant third parties"). We also agree that — on the basis of the allegations in the complaints — the defendants' alleged misconduct had a "determinative or coercive" effect on the Shooter. *See Bennett*, 520 U.S. at 169. In either situation, the second *Lujan* element is satisfied.

i.

First, the plaintiffs have sufficiently alleged that the defendants' conduct had a "predictable effect" on the actions of the Shooter, such that the defendants are at least in part responsible for causing the plaintiffs' injuries. Indeed, the complaints specify that the defendants deliberately designed their advertisements to appeal to impulsive, risk-seeking young men; *see* Lowy Complaint ¶ 55 (alleging that defendants' "advertisements are especially salient for—and are targeted to attract—troubled young men attracted to violent combat, increasing the risk that these young men will use [d]efendants' deadly weapons, weapon accessories, and ammunition to perpetrate mass violence"); that the defendants' advertisements promote the use of military-style weapons (i.e., AR-15s) to civilians who

29

have no lawful reason to use them as advertised, *id.* ¶¶ 57-94; that the defendants "knew or should have known" that young men such as the Shooter regularly commit mass shootings using weapons like the ones they advertise, *id.* ¶ 104; and that the defendants knew or should have known that marketing their products in such a manner would have an impact on the Shooter's decision to amass and use the defendants' weapons and accessories to heinously injure the plaintiffs, *id.* ¶¶ 105, 106. At the Rule 12(b)(1) stage — where the plaintiffs' burden is "relatively modest," *see DiCocco*, 52 F.4th at 592 — these detailed and thorough factual allegations were and are sufficient to show "a causal connection between the injury and the conduct complained of," *see Brown*, 600 U.S. at 561.

For their part, the defendants resist this straightforward conclusion, and they do so primarily by maintaining that they were not "the ones who opened fire on [the] school." *See* Br. of Appellees 11. As the plaintiffs argue, however, that reasoning "fundamentally misstates the relevant inquiry." *See* Reply Br. of Appellants 4. To be sure, Article III standing "does not require the [defendants'] challenged action to be the sole or even immediate cause of the injury." *See Sierra Club v. U.S. Dep't of the Interior*, 899 F.3d 260, 284 (4th Cir. 2018). Instead, so long as the defendants' conduct had a "predictable effect" on the Shooter's conduct, the second *Lujan* element is satisfied. *See Dep't of Com.*, 588 U.S. at 768; *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 383-85 (2024).

Our conclusion in that respect finds solid support in the authorities relied on by the defendants. *See* Br. of Appellees 16. In *Block v. Meese*, then-Circuit Judge Scalia cogently explained that "[i]t is impossible to maintain, of course, that there is no standing to sue

30

regarding action of a defendant which harms the plaintiff only through the reaction of third persons." *See* 793 F.2d 1303, 1309 (D.C. Cir. 1986). Rather, as *Block* clarified, if the plaintiff alleges sufficient facts demonstrating the effect of a defendant's actions on a third party (whose actions in turn harmed the plaintiff), the plaintiff has "adequately alleged" Article III standing, "which requires no more than *de facto* causality." *Id.*

ii.

(a)

Next, we turn to whether the plaintiffs sufficiently alleged that the defendants' actions had a "determinative or coercive effect" on the Shooter. On that score, the district court chided the plaintiffs for offering "no factual allegations . . . [to] support the conclusion that Shooter relied on defendants' marketing," explaining that their allegations "concerning [the Shooter's] reliance on defendants' marketing . . . are conclusory." *See* Dismissal Ruling 5. From there, the court reasoned that "the actions of a third party injured plaintiffs," and that "completing the causal chain requires plaintiffs to allege defendants' conduct had a determinative or coercive effect on that third party's injurious actions." *Id.* at 6. According to the Dismissal Ruling, however, the complaints failed to allege "that defendants' advertising coerced Shooter to attack the elementary [sic] school." *Id.*

Simply put, we disagree. As our Court has explained, the "determinative or coercive effect" standard is satisfied when the defendant publishes information which leads a third party to conclude that it should proceed in a manner that injures a plaintiff. *See Lansdowne on the Potomac Homeowners Ass'n, Inc. v. OpenBand at Lansdowne, LLC*, 713 F.3d 187,

31

197 (4th Cir. 2013). In *Lansdowne*, Judge Wilkinson carefully explained that the plaintiff, a homeowner's association, had "established the second element of the Article III standing inquiry" by showing that the defendant's conduct and actions caused third-parties — i.e., cable providers Verizon and Comcast — to refrain from providing any cable services to the plaintiff. *Id.* Our distinguished colleague thus concluded that the *Lansdowne* plaintiff had suffered an injury-in-fact that was "produced by the determinative or coercive effect" of the defendant's conduct "upon the action of someone else." *Id.* (citation modified).

Much like the allegations in the *Lansdowne* case, the complaints in these proceedings have sufficiently alleged that the defendants' marketing and advertisements had a determinative or coercive effect in causing a third party (i.e., the Shooter, a self-described "AR-15 aficionado") to commit this monstrous school shooting — a senseless and needlessly tragic event that closely mirrored the imagery included in the defendants' advertisements. *See generally* Lowy Complaint ¶ 57-102 (defendants' advertisements); *see also id.* ¶ 121 (alleging that "the Shooter assembled [d]efendants' products to create customized weapons of war for use in the Shooting"); *id.* ¶ 122 (specifying that "the Shooter also purchased various weapons, weapon accessories, and ammunition online from a number of retailers, exposing the Shooter to [d]efendants' products and advertisements").

Resisting this straightforward conclusion in its own right, the Dismissal Ruling made much of the fact that the plaintiffs did not specifically allege that the "defendants' advertising coerced the [Shooter] to attack the elementary [sic] school." *See* Dismissal Ruling 6. But that rationale amounts to nothing more than a "magic words" pleading

32

requirement, which courts have routinely cautioned against. *See, e.g., Barron v. United States*, 111 F.4th 667, 674 (5th Cir. 2024) (recognizing that "[f]ederal pleading standards do not demand 'any magic words'"). Instead, in evaluating the defendants' motions to dismiss for lack of Article III standing, the court was required — but fatally failed — to "presume that general allegations embrace those specific facts that are necessary to support the claim." *See Lujan*, 504 U.S. at 561. And here, it is apparent that the plaintiffs' detailed and thorough factual allegations sufficiently demonstrate that the defendants' conduct had a "determinative or coercive effect" on the Shooter's actions related to the shooting.[11]

(b)

Additionally, we are entirely unpersuaded by the district court's rationale that the plaintiffs' allegations in the complaints that are predicated on "information and belief" are only an appropriate pleading practice when the necessary information is exclusively in the defendants' control. *See* Dismissal Ruling 6 ("The complaint does not suggest defendants control such evidence of [the Shooter's] reliance and does no more than speculate that [the Shooter], like other young men in Virginia, observed defendants' advertisements. Without more support, these pleadings fail to raise plaintiffs' right to relief above the speculative level and can proceed no further."). As the plaintiffs emphasize, however, such reasoning

---

[11] We readily reject the defendants' contention that the Article III causation element required the pleading of allegations that the Shooter saw each example of the defendants' allegedly unlawful advertisements. *See* Br. of Appellees 11-13. Not only does that assertion overstate the plaintiffs' burden, *see Robertson*, 679 F.3d at 291, it ignores the fact that the relevant information about the Shooter's interactions with the defendants is held by them and other third-parties, such as law enforcement — not by the plaintiffs.

33

overlooks the important fact that "information supporting [their] claims may well be in [the defendants'] possession, given that [the defendants] control and/or have access to their own social media, online platforms, and mailing lists."  *See* Br. of Appellant 33.

Not only that, but the district court's mystifying rejection of "information and belief" pleading in a complaint gets the law wrong.  To be sure, that pleading practice is expressly authorized by the applicable Rules of Civil Procedure, when the allegations are based "on sufficient factual material that makes the inference of culpability plausible." *See Ahern Rentals, Inc. v. EquipmentShare.com, Inc.*, 59 F.4th 948, 954 (8th Cir. 2023) (explaining that federal courts "cannot always expect plaintiffs to provide robust evidentiary support for their allegations at the pleading stage because, in some contexts, that information may not be available to [the plaintiffs] before discovery").  As Rule 11(b)(3) of the Federal Rules of Civil Procedure specifically contemplates,

> [a]n attorney or unrepresented party certifies that to the best of the person's knowledge, *information*, and *belief*, formed after an inquiry reasonable under the circumstances: . . . the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery[.]

*See* Fed. R. Civ. P. 11(b)(3) (emphasis added).[12]  In other words, factual "allegations pled on information and belief are not categorically insufficient to state a claim for relief where

---

[12]   Our sister circuits have consistently agreed that factual allegations that are pleaded on "information and belief" are not to be rejected under *Twombly* where "the facts are peculiarly within the possession and control of the defendant, *or* where the belief is based on factual information that makes the inference of culpability plausible." *See Arista Recs. LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010) (emphasis added); *see also Menard v. CSX Transp., Inc.*, 698 F.3d 40, 45 (1st Cir. 2012); *McDermott v. Clondalkin Grp., Inc.*, (Continued)

the proof supporting the allegation is within the sole possession and control of the defendant *or* where the belief is based on sufficient factual material that makes the inference of culpability plausible." *See Ahern Rentals*, 59 F.4th at 954 (emphasis added).[13]

In making those errors, the Dismissal Ruling disregarded numerous factual allegations of the complaints that the plaintiffs had properly pleaded on information and belief. *Cf. Colon Health Ctrs. of Am., LLC v. Hazel*, 733 F.3d 535, 545 (4th Cir. 2013) (recognizing that "dismissal [cannot be] based on a judge's disbelief of a complaint's factual allegations"). And those disregarded allegations — which serve to support the plaintiffs' belief that the defendants' allegedly unlawful marketing practices had a determinative or coercive effect on the Shooter's heinous acts — include the following:

- That the Shooter specifically chose the defendants' products to execute the shooting at the Burke School, *see* Lowy Complaint ¶ 120 ("Though he owned numerous other weapons, weapon accessories, and boxes of ammunition, [d]efendants' products were his weapons, weapon accessories, and ammunition of choice. Upon information and belief, the Shooter made these choices because he perceived these weapons, accessories, and ammunition to be a superior fit for carrying out his mission of causing the most destruction possible.");

---

649 Fed. App'x 263, 267-68 (3d Cir. 2016); *Innova Hosp. San Antonio, Ltd. P'ship v. Blue Cross & Blue Shield of Ga., Inc.*, 892 F.3d 719, 730 (5th Cir. 2018); *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. Walgreen Co.*, 631 F.3d 436, 442-43 (7th Cir. 2011); *Soo Park v. Thompson*, 851 F.3d 910, 928 (9th Cir. 2017); *Kareem v. Haspel*, 986 F.3d 859, 866 (D.C. Cir.), *cert. denied sub nom.*, *Kareem v. Burns*, 142 S. Ct. 486 (2021).

[13] We observe that, in chastising the plaintiffs' pleading practices in the complaints, the district court relied on authority that allegations made on information or belief are entirely permissible. *See, e.g.*, *Ridenour v. Multi-Color Corp.*, 147 F.Supp.3d 452, 456 (E.D. Va. 2015) (collecting decisions regarding propriety of information and belief pleading practice, including when plaintiffs have relied "on second-hand information").

- That the Shooter assembled the defendants' products after searching online for "how-to instructions and instructional videos," *id.* ¶ 121 ("Upon information and belief, the Shooter assembled [d]efendants' products to create customized weapons of war for use in the Shooting. The Shooter's online presence suggests that he did so after searching online for how-to instructions and instructional videos."); and

- That the Shooter used the defendants' dangerous and deadly weapons in ways that closely mirrored their pre-shooting marketing activities, *id.* ¶ 123 ("Upon information and belief, the Shooter was exposed to and influenced by [d]efendants' deceptive and unfair marketing acts and practices while researching and planning the Shooting.").

These factual allegations in the complaints are not at all "speculative," and otherwise show "facts supporting the allegations that were pleaded [by the plaintiffs] upon information and belief." *See Kashdan v. George Mason Univ.*, 70 F.4th 694, 702 (4th Cir. 2023).

(c)

Finally, that the defendants' conduct may not have been the "last step in the chain of causation" does not alter the result we reach today. *See Bennett*, 520 U.S. at 169. As the Supreme Court explained in its 1997 *Bennett* decision, for an injury-in-fact to be "fairly traceable" to a defendant's conduct, it matters not whether the defendant's "actions are the very last step in the chain of causation." *Id.* Rather, so long as a defendant is "keenly aware" of the "virtually determinative effect" of its conduct on the alleged actions of a third party (in this situation, the Shooter), a plaintiff has sufficiently alleged that the defendant's actions had a "determinative or coercive effect" on the third party. *Id.* at 170. As in the Court's *Bennett* decision, "it is not difficult to conclude [here] that [the plaintiffs] have met their burden — which is relatively modest at this stage of the litigation — of alleging that their injury is 'fairly traceable' to the" the defendants' alleged conduct. *Id.*

36

\* \* \*

At bottom, the plaintiffs' theory of Article III standing — and, in particular, their theory of *Lujan* causation — is cognizable and survives the defendants' Rule 12(b)(1) motions to dismiss. To that end, the plaintiffs' burden as to the issue of Article III causation is "relatively modest" at the "motion-to-dismiss stage." *See DiCocco*, 52 F.4th at 592. Spanning hundreds of paragraphs, the complaints specify that the defendants marketed their assault weapons and other related products in a manner that promotes the militaristic and unlawful use of those products; that the defendants knew their advertisements contained content unsuitable for certain audiences and that such marketing could lead to mass shootings; that the defendants' deceptive marketing specifically targeted young men like the Shooter; that the Shooter — a self-identified "AR-15 aficionado" — was exposed to and influenced by the defendants' unlawful marketing while planning the April 2022 shooting at the Burke School; and that specific advertisements published by the defendants and promoted just before the shooting bear a striking resemblance to the sniper-style assault that brutally maimed and injured the plaintiffs. Because we are satisfied that the plaintiffs possess Article III standing to sue, we reverse the Dismissal Ruling in that regard.

## B.

After concluding that the plaintiffs lacked the requisite Article III standing to sue, the district court went on to dismiss each of the plaintiffs' claims on the merits — pursuant to Rule 12(b)(6) — on the sole basis that a 2005 federal enactment (i.e., the PLCAA) bars the plaintiffs' claims against the defendants. For differing reasons, all the parties have

37

surprisingly argued that we are entitled to reach and assess that statutory aspect of the Dismissal Ruling. We readily reject those invitations. Instead, as discussed below, we are obliged to vacate, set aside, and hold for naught the remainder of the Dismissal Ruling.[14]

1.

In the Supreme Court's seminal 1868 case of *Ex parte McCardle*, then-Chief Justice Salmon Chase explained that "[w]ithout jurisdiction [a] court cannot proceed at all in any cause. Jurisdiction is power to declare the law, and when it ceases to exist, the *only function* remaining to the court is that of announcing the fact and dismissing the cause." *See* 74 U.S. 506, 514 (1868) (emphasis added); *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998) (quoting *Ex parte McCardle*, 74 U.S. at 514). Put differently, when a federal court has ruled that it lacks subject-matter jurisdiction, it must dismiss the case. The court can do nothing else without exceeding the lawful bounds of its Article III judicial authority.

To that end, by its *Steel Co.* case in 1998, the Supreme Court again held that, under Article III, a federal court must satisfy itself of subject-matter jurisdiction before considering the merits of an alleged claim. Stated otherwise, a federal court cannot assume

---

[14] We pause to mention an important and salient point: our vacatur of the remaining balance of the Dismissal Ruling is not an indication — in any way — of agreement with Judge Quattlebaum's unnecessary and passing assessment in his dissenting opinion of whether the PLCCA serves as a valid basis for a Rule 12(b)(6) dismissal of the plaintiffs' lawsuits against these defendants. *See post* at 69 ("And, if I agreed with the majority that the district court erred in its jurisdictional assessment, I would see nothing wrong with affirming dismissal of most defendants on the basis of the district court's alternative holding."). Put simply, that assessment is not authoritative in any manner, in that our dissenting colleague does not "possess a roving writ to gratuitously decide an interesting . . . issue." *See Palmer v. Liberty Univ.*, 72 F.4th 52, 68, n.8 (4th Cir. 2023).

that Article III's jurisdictional requirements are satisfied, simply to reach the merits of an "interesting . . . issue." *See Palmer v. Liberty Univ.*, 72 F.4th 52, 68 n.8 (4th Cir. 2023) (recognizing that federal courts do "not possess a roving writ to gratuitously decide an interesting . . . issue"). Writing for the Court in *Steel Co.*, Justice Scalia cogently explained:

> While some of the . . . cases must be acknowledged to have diluted the absolute purity of the rule that Article III jurisdiction is always an antecedent question, none of them even approaches approval of a doctrine of "hypothetical jurisdiction" that enables a court to resolve contested questions of law when its jurisdiction is in doubt. Hypothetical jurisdiction produces nothing more than a hypothetical judgment — which comes to the same thing as an advisory opinion, disapproved by this Court from the beginning. *Muskrat v. United States*, 219 U.S. 346, 362 (1911); *Hayburn's Case*, 2 Dall. 409 (1792). Much more than legal niceties are at stake here. The statutory and (especially) constitutional elements of jurisdiction are an essential ingredient of separation and equilibration of powers, restraining the courts from acting at certain times, and even restraining them from acting permanently regarding certain subjects. *See United States v. Richardson*, 418 U.S. 166, 179 (1974); *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 227 (1974). For a court to pronounce upon the meaning or the constitutionality of a state or federal law when it has no jurisdiction to do so is, by very definition, for a court to act ultra vires.

*See* 523 U.S. at 101 (citation modified); *accord Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 577 (1999) (relying on *Steel Co.* precedent for proposition that "[t]he requirement that jurisdiction be established as a threshold matter . . . is *inflexible* and *without exception* . . . for jurisdiction is power to declare the law . . . and without jurisdiction the court cannot proceed at all in any cause" (citation modified) (emphasis added)).

After determining that the plaintiffs lacked Article III standing to sue, the Dismissal Ruling proceeded to dismiss the plaintiffs' claims on their merits, reasoning that the complaints had failed to state a plausible claim upon which relief could be granted. But

pursuant to the *Ex parte McCardle* and *Steel Co.* precedents, the district court was not authorized to render such impermissible and advisory merits rulings. *See MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007) (recognizing that federal courts cannot issue advisory opinions that merely address "what the law would be upon a hypothetical set of facts" (citation modified)). Rather, applying applicable precedent, the court could only have dismissed these complaints without prejudice. *See, e.g.*, *Ali v. Hogan*, 26 F.4th 587, 595 (4th Cir. 2022); *Goldman v. Brink*, 41 F.4th 366, 369 (4th Cir. 2022).

Such an outcome is also consistent with the approach taken by the Second Circuit — that is, if a court dismisses a case for lack of subject-matter jurisdiction, then it does not possess the power to adjudicate a Rule 12(b)(6) motion to dismiss for failure to state a claim. *See, e.g.*, *Morrison v. Nat'l Australia Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008) ("Determining the existence of subject matter jurisdiction is a threshold inquiry[.]"); *Harty v. Simon Prop. Grp., L.P.*, 428 Fed. App'x 69, 72-73 (2d Cir. 2011) ("Because the district court dismissed [the plaintiff's] ADA claim for lack of standing, however, it lacked jurisdiction to adjudicate [the defendant's] alternative motion to dismiss for failure to state a claim."). In such a case, the Rule 12(b)(6) ruling must be set aside, as there is otherwise no Rule 12(b)(6) motion "that is subject to our review on appeal." *See Harty*, 428 Fed. App'x at 73. Simply put, once a court concludes that there is a lack of Article III standing,

40

it "lacks the power to adjudicate the merits of the case" or "to dismiss a case with prejudice." *See Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 54-55 (2d Cir. 2016).[15]

Again, there is no reason at all to depart from the *Ex parte McCardle* and *Steel Co.* precedents, even out of concern for "judicial economy." As the Supreme Court declared in *Ruhrgas AG v. Marathon Oil*, "[t]he requirement that jurisdiction be established as a threshold matter . . . is inflexible and without exception[.]" *See* 526 U.S. at 577. To depart from that principle in this situation — i.e., by sanctioning and reviewing the district court's advisory rulings on the merits — simply undermines the controlling mandate that a federal court must cease judicial activity once it rules that subject-matter jurisdiction is lacking.[16]

---

[15] We observe that the district court's dismissal practice is problematic for another solid reason. Although a dismissal for lack of Article III standing is without prejudice, *see Ali*, 26 F.4th at 595, a dismissal under Rule 12(b)(6) is made with prejudice, unless specifically ordered otherwise, *see, e.g.*, *Carter v. Norfolk Cmty. Hosp. Ass'n, Inc.*, 761 F.2d 970, 974 (4th Cir. 1985) ("A district court's dismissal under Rule 12(b)(6) is, of course, with prejudice unless it specifically orders dismissal without prejudice."). Here, the Dismissal Ruling did not specify whether the court's improvident Rule 12(b)(6) dismissals were with or without prejudice, such that they were made with prejudice. *Id.*

[16] Our dissenting colleague suggests that this Court has heretofore "affirmed a district court's alternative holding after finding the district court erred in dismissing an action for lack of subject-matter jurisdiction." *See post* at 68 (citing *Food Town Stores, Inc. v. E.E.O.C.*, 708 F.2d 920, 923-25 (4th Cir. 1983), and *Protopapas v. Travelers Cas. & Sur. Co.*, 94 F.4th 351, 358-59 (4th Cir. 2024)). Notably, neither decision cited by the dissent involved a district court concluding that a plaintiff lacked Article III standing to sue in federal court — an "irreducible constitutional minimum" that must be satisfied in every case, *see Lujan*, 504 U.S. at 560 — followed by an alternative "advisory" and with-prejudice dismissal of an action under Rule 12(b)(6). *See Food Town Stores, Inc.*, 708 F.2d at 923-25 (district court dismissing case for lack of subject-matter jurisdiction under 28 U.S.C. § 1331 and alternatively reaching merits at summary judgment stage); *Protopapas*, 94 F.4th at 353 (district court dismissing case for lack of subject-matter jurisdiction under 28 U.S.C. § 1332 and alternatively concluding that procedural defect precluded removal).

41

2.

Turning to the appropriate remedy, we will briefly explain our decision to vacate those aspects of the Dismissal Ruling that are impermissible and merely advisory, consistent with *Ex parte McCardle* and *Steel Co.* As heretofore emphasized, the district court's ruling on Article III standing deprived it of any authority to adjudicate the merits of these cases. Therefore, the court acted *ultra vires* by reaching the merits and dismissing the complaints — with prejudice — under Rule 12(b)(6) of the Rules of Civil Procedure.

Put most simply, the district court had rendered moot the balance of its Dismissal Ruling by its initial determination concerning Article III standing. In somewhat analogous circumstances, the Supreme Court has aptly recognized that the vacatur of an underlying judgment — which is rendered moot by vagaries and happenstance, as opposed to any voluntary party conduct — is entirely appropriate, insofar as it "clears the path for future relitigation of the issues between the parties." *See Alvarez v. Smith,* 558 U.S. 87, 94 (2009). Consistent with that proposition, we vacate, set aside, and hold for naught the unreviewed advisory aspects of the Dismissal Ruling — that is, the district court's improvident determinations that the plaintiffs' claims are each barred by the PLCAA.[17]

---

[17] To the extent the plaintiffs have also raised another challenge to the procedural propriety of the Dismissal Ruling — i.e., by maintaining that it fails to comply with the Federal Rules of Civil Procedure insofar as it dismissed three defendants on grounds that those defendants did not raise, along with a contention that the district court impermissibly dismissed the Harris case against defendant FAB Manufacturing absent a proper motion to that effect, *see* Br. of Appellant 64 — those matters are for the remand proceedings.

42

IV.

Pursuant to the foregoing, we reverse the district court's Article III standing ruling.

We also vacate, set aside, and hold for naught the advisory aspects of the Dismissal Ruling,

and remand for such other and further proceedings as may be appropriate.

*REVERSED IN PART,*
*VACATED IN PART,*
*AND REMANDED*

QUATTLEBAUM, Circuit Judge, dissenting:

Sadly, the facts of this case are both tragic and familiar. Week after week, month after month and year after year, we learn of deaths and injuries from another senseless shooting. Sometimes they're from handguns in our nation's biggest cities. Sometimes they're mass shootings with more potent weapons. Sometimes the victims are random. Sometimes they're members of a group the shooter hates. More recently, they've even been political leaders.

But neither the tragic facts nor the prevalence of gun violence alter our responsibility as judges. Our job, as always, is to follow the law wherever it takes us.[1] If we do that, our task here, while sad, is not hard. Defendants made and sold dangerous but legal products. A disturbed individual used those products to commit an unspeakable crime. The disturbed individual, not the makers and sellers of lawful products, caused plaintiffs' injuries.

Grasping for legal straws, plaintiffs allege that defendants' advertisements caused the disturbed individual not only to buy the weapons and ammunition but also to shoot at students, parents and school employees. The law places a high burden on holding a defendant liable when an independent third party is the last link in an attenuated causal

---

[1] That doesn't mean we have no feelings about these issues. Like others, we ask questions like "why does this keep happening?" and "can't we do something to stop this?" And those of us who believe in a divine being pray about them in the quiet of our homes, asking questions like, "How long, O Lord, must I cry out for help, but You do not listen?" *Habakkuk* 1:2.

chain between defendants' actions and plaintiffs' injuries. Speculation or guesswork will not do.

But that is all plaintiffs in this case have. They do not allege the disturbed individual even saw defendants' advertisements. They do not explain how the ads caused this individual—even if he saw them—both to buy the guns and ammunition and to commit this horrible crime. Plaintiffs simply make broad and conclusory allegations. Under the law, that is not enough. Plaintiffs fail to plead facts that show their injuries are traceable to defendants' conduct under Article III. But even if they passed that bar, the plaintiffs certainly failed to allege facts that plausibly plead defendants' conduct proximately caused their injuries. Either way, the result is the same—plaintiffs' complaints must be dismissed.

I respectfully dissent.

## I.

I begin with the standard for assessing traceability in cases where a plaintiff seeks to hold a defendant liable when an independent third party is the last link in a causal chain to that plaintiff's injuries. Ultimately, I conclude that the district court articulated and applied the correct standard. But, even if the district court articulated the standard incorrectly, plaintiffs' allegations fail to show traceability under the most generous standard that can be discerned from Supreme Court decisions.

Having explained that the district court correctly dismissed plaintiffs' complaint under existing standing principles, I then show that even if these principles conflate standing with the merits question of causation, plaintiffs' complaints should still be

dismissed under Rule 12(b)(6) because they do not plausibly allege facts that, even if true, show proximate cause.

**A.**

Article III of the Constitution limits federal courts' authority to deciding "Cases" and "Controversies." U.S. CONST. art. III, § 2. Under the Supreme Court's interpretation of this requirement, a plaintiff must show, among other things, that he has standing. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). The "irreducible constitutional minimum of standing contains three elements"—(1) the plaintiff must have suffered an "injury in fact" (2) that is "fairly . . . trace[able] to the challenged action of the defendant" and (3) for which the court can likely provide some redress. *Id.* at 560–61 (alterations in original) (citations omitted).

The second of these elements—traceability—asks whether there is some "causal connection" between a plaintiff's injury and the defendant's unlawful conduct. *Id.* at 560. This requirement "screens out plaintiffs who were not injured by the defendant's action." *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 383 (2024). Under this limitation, "injury that results from the independent action of some third party not before the court" will not establish our jurisdiction. *Simon v. E. Ky. Welfare Rts. Org.*, 426 U.S. 26, 41–42 (1976). Still, plaintiffs do not have to allege that defendants' actions were "the sole or even immediate cause of the injury." *Sierra Club v. U.S. Dep't of the Interior*, 899 F.3d 260, 284 (4th Cir. 2018). So, when a plaintiff is directly injured by a third party, the injury may still be fairly traceable to a defendant's upstream conduct when the third party's

46

actions form the last link in a chain of causation. *See Bennett v. Spear*, 520 U.S. 154, 168–69 (1997).

Additionally, the nature of proof required for the plaintiff to make this showing is consistent "with the manner and degree of evidence required at the successive stages of the litigation." *Lujan*, 504 U.S. at 561. So, at the pleading stage, we presume the truth of the plaintiff's allegations and construe those allegations in the plaintiff's favor. *Id.*; *David v. Alphin*, 704 F.3d 327, 333 (4th Cir. 2013). But, much like when we assess a motion to dismiss for failure to state a claim under Rule 12(b)(6), we do not "take account of allegations in the complaint labeled as fact but that constitute nothing more than 'legal conclusions' or 'naked assertions.'" *See David*, 704 F.3d at 333 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). Moreover, we must bear in mind that the plaintiff's burden is plausibility, not possibility—"[w]here a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Iqbal*, 556 U.S. at 678 (internal quotation marks omitted) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007)); *accord Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) ("Where, as here, a case is at the pleading stage, the plaintiff must 'clearly . . . allege facts demonstrating' each element [of standing]." (first alteration in original) (quoting *Warth v. Seldin*, 422 U.S. 490, 518 (1975))).

**B.**

The district court determined that plaintiffs had not alleged that their injuries were "fairly traceable" to defendants' conduct. J.A. 329. The court explained that it is difficult,

47

but not impossible, for plaintiffs to establish their chain of causation in circumstances like these, where an independent third party is directly responsible for their injuries. To meet this high bar, plaintiffs had to allege that defendants' actions had a "determinative or coercive effect" on the third party. J.A. 330. The court determined plaintiffs' allegations failed to do this for two reasons. First, plaintiffs' only allegations about the shooter's reliance on defendants' marketing were conclusory. Second, even if the complaints plausibly alleged the shooter relied on defendants' marketing when choosing to purchase a firearm or other products, the complaints did not allege that the ads had a "'determinative or coercive effect' on the shooter's decision to shoot at plaintiffs." J.A. 331.

On appeal, plaintiffs argue that the district court applied the wrong standard. Relying on the Supreme Court's decision in *Department of Commerce v. New York*, 588 U.S. 752, 768 (2019), plaintiffs argue that they need only have alleged that defendants' conduct had a "predictable effect" on the shooter. And they claim they met that standard.

In response, defendants argue that the district court was correct in asking whether plaintiffs alleged a "determinative or coercive effect." They argue that this was the standard announced by the Supreme Court in *Bennett*, 520 U.S. at 169, when the Court stated that the defendant's actions had a "determinative or coercive effect upon the action of someone else." And they insist that the Supreme Court did not announce a new standard in *Department of Commerce*. Thus, under the *Bennett* "determinative or coercive effect" standard, defendants argue plaintiffs' allegations fail.

48

The majority largely agrees with plaintiffs. It believes that, in *Bennett* and *Department of Commerce*, the Supreme Court provided two different, alternative tests for standing. And because the majority finds plaintiffs met the *Department of Commerce* "predictable effect" standard—apparently the more generous of these two tests—the majority concludes that plaintiffs have standing. But it alternatively reasons that plaintiffs also established standing under the "determinative or coercive effect" standard.

## C.

To me, it's hard to tell from the Supreme Court's decisions which test we should apply—or whether the Supreme Court provided two different tests at all. On the one hand, nowhere in *Department of Commerce* did the Court give any indication that it was creating a new standard or departing from any previous test. *See* 588 U.S. at 768. And its first citation after using the "predictable effect" language was to *Bennett*. *See Dep't of Com.*, 588 U.S. at 768 (first citing *Bennett*, 520 U.S. at 169–70; and then citing *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734–35 (2008)). Also, since deciding *Department of Commerce*, the Court has described its standard for traceability in cases when injuries are directly caused by someone other than the defendant by citing to both *Department of Commerce* and *Bennett*. *See All. for Hippocratic Med.*, 602 U.S. at 382–84. In doing so, it has given no indication that these two cases are in tension. *See id.* So, perhaps the Supreme Court's "predictable effect" language in *Department of Commerce* is not a new, lower standard? Perhaps it simply restates *Bennett*'s "determinative or coercive effect" standard using different words? This reading would seem to support defendants' position.

49

On the other hand, despite deciding several cases on traceability for injuries caused by third parties over the last 30 years, the Supreme Court has not repeated the "determinative or coercive" language it used in *Bennett* since that 1997 decision. And it is reasonable to construe linguistic differences between the "determinative or coercive effect" language from *Bennett* and the "predictable effect" language from *Department of Commerce*. "Determine" means "to settle (a dispute, question, etc.) conclusively; decide" or "to establish or affect the nature, kind, or quality of; fix." *Determine*, WEBSTER'S NEW WORLD COLLEGE DICTIONARY (3d ed. 1997). "Coerce" means "to restrain or constrain by force, esp. by legal authority." *Coerce*, WEBSTER'S NEW WORLD COLLEGE DICTIONARY (3d ed. 1997). And "predict" simply means "to declare or indicate in advance: *esp* : foretell on the basis of observation, experience, or scientific reason." *Predict*, MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY (11th ed. 2020).[2] From these definitions, all three words imply discerning some level of connection between a past event and a future event. But conclusively deciding, fixing or constraining a particular outcome is more definitive than foretelling an event in advance based on observation of one's present circumstances, even if such foretelling involves a degree of reliability from observation, experience or

---

[2] I am using a dictionary from around the time the Supreme Court decided *Bennett* to define "determine" and "coerce" and a dictionary from around the time the Supreme Court decided *Department of Commerce* to define "predict." The definition of "predict," however, is essentially the same in the 1997 dictionary. *See Predict*, WEBSTER'S NEW WORLD COLLEGE DICTIONARY (3d ed. 1997) (defining "predict" as "to say in advance (what one believes will happen); foretell (a future event or events)"). And I saw no meaningfully different definitions of these words in other dictionaries.

scientific reason. So, this distinction would seem to support the position taken by plaintiffs and the majority.

Still, despite any linguistic differences between *Bennett* and *Department of Commerce*, it's hard to see from Supreme Court decisions if the two phrases used in those cases really indicate different standards. That's because, rather than focusing on those labels, the Supreme Court's description of the applicable standard has been consistent in other respects. Notably, the Court has made clear on several occasions that, in cases like this one, plaintiffs face a high burden. *See, e.g.*, *California v. Texas*, 593 U.S. 659, 675 (2021) ("[W]here a causal relation between injury and challenged action depends upon the decision of an independent third party . . . , standing is not precluded, but it is ordinarily substantially more difficult to establish." (internal quotation marks omitted) (quoting *Lujan*, 504 U.S. at 562)); *Allen v. Wright*, 468 U.S. 737, 757–58 (1984); *Simon*, 426 U.S. at 44–45; *Warth*, 422 U.S. at 505; *see also All. for Hippocratic Med.*, 602 U.S. at 382. And it has made clear that mere speculation or guesswork about how a defendant's actions impact a third party does not meet this standard. *See, e.g.*, *Murthy v. Missouri*, 603 U.S. 43, 57–58 (2024); *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 413 (2013); *Allen*, 468 U.S. at 758–59; *Simon*, 426 U.S. at 42–45; *cf. Dep't of Com.*, 588 U.S. at 768 (finding third party actions were not speculative). Indeed, the Court has suggested that, under this high standard, "attenuated links" between a defendant's conduct and "far removed" third-party actions are not going to cut it "*even if predictable*." *All. for Hippocratic Med.*, 602 U.S. at 383 (emphasis added). *But see Diamond Alt. Energy, LLC v. Env't Prot. Agency*, 606 U.S.

51

100, 112 (2025) ("Courts must distinguish the 'predictable' from the 'speculative' effects of government action or judicial relief on third parties." (quoting *All. for Hippocratic Med.*, 602 U.S. at 383)).

**D.**

So, what do we do with all this? To me, while the precise contours of traceability are a bit unclear, the appropriate disposition of this case is not. Here's why. First, despite the confusion, our circuit's precedent is more clear and remains binding on this panel. Second, there are several reasons why plaintiffs' claims fail under Supreme Court precedent regardless of any difference in language between *Bennett* and *Department of Commerce*.

**1.**

I start with our precedent. Recently, we explained in *Sheppheard v. Morrisey* that "[w]hen multiple actors are involved, a plaintiff can establish causation *only if* the defendant's conduct had a 'determinative or coercive effect upon the action of someone else.'" 143 F.4th 232, 243 (4th Cir. 2025) (emphasis added) (quoting *Bennett*, 520 U.S. at 169). And we reached the same conclusion before that in an unreported opinion. *Alvarez v. Becerra*, No. 21-2317, 2023 WL 2908819, at *3 (4th Cir. April 12, 2023) ("Indeed, where multiple actors are involved, a plaintiff can establish causation *only if* the defendant's conduct had a 'determinative or coercive effect upon the action of someone else.'" (emphasis added) (quoting *Bennett*, 520 U.S. at 169)). While we did not address *Department of Commerce* in either *Sheppheard* or *Alvarez*, we decided both of those cases

52

years after that Supreme Court decision. And in so doing, we found that there is but one path for a plaintiff to establish traceability between a defendant's conduct and a third-party's actions—a showing that the defendants' conduct had a "determinative or coercive effect" on the actions of the third party. *See Sheppheard*, 143 F.4th at 243; *Alvarez*, 2023 WL 2908819, at *3. Thus, to the extent there is a question over whether, without saying so, the Supreme Court created a new test in *Department of Commerce*, *Sheppheard* suggests we have already implicitly answered that question—it didn't.

The majority resists this conclusion. Instead of following *Sheppheard*, it relies on the Second Circuit's contrary decision in *Ateres Bais Yaakov Academy of Rockland v. Town of Clarkstown*, 88 F.4th 344 (2d Cir. 2023). In that case, the Second Circuit reasoned, without citing or referencing *Bennett*, that "'determinative or coercive effect['] . . . sounds in proximate cause, which . . . overstates the showing that is required" for a plaintiff to demonstrate traceability. *Ateres*, 88 F.4th at 352 (citation omitted). But even though *Ateres* conflicts with *Sheppheard*, the majority relegates *Sheppheard* to a mere footnote, mainly because it did not discuss *Department of Commerce*. True, a panel of our court is not bound by a prior panel's decision that is untenable with Supreme Court authority. *United States v. Banks*, 29 F.4th 168, 178 (4th Cir. 2022). But the majority doesn't claim that to be our situation. And, given the lack of clarity about the relationship between *Bennett* and *Department of Commerce*, we couldn't say following *Sheppheard* would "bind us to a path inconsistent with the Supreme Court's dictates." *Cf. Rose v. PSA Airlines, Inc.*, 80 F.4th 488, 504 (4th Cir. 2023); *accord Payne v. Taslimi*, 998 F.3d 648, 653–55, 655 n.4 (4th Cir.

53

2021) (explaining that a prior panel's decision is usually binding on future panels except, *inter alia*, "where Supreme Court decisions, 'clearly undermine[]' a panel precedent" (alteration in original) (quoting *United States v. Williams*, 155 F.3d 418, 421 (4th Cir. 1998))). As a result, we can't just cast *Sheppheard* aside. *See Payne*, 998 F.3d at 653–55, 654 nn.2–3, 655 n.4; *McMellon v. United States*, 387 F.3d 329, 332–33 (4th Cir. 2004) (en banc) (making clear a panel is typically bound by prior panel decisions). That means *Sheppheard* controls.

Applying that standard, plaintiffs' allegations unquestionably fail. Plaintiffs never allege any facts that, if accepted as true, would show that defendants' advertisements were the decisive factor in the shooting or compelled the shooter to fire that day. For example, several times plaintiffs allege "[u]pon information and belief" that the shooter was "exposed to and influenced by" defendants' ads at some point when deciding whether to purchase defendants' products. J.A. 81, 165. To state the obvious, being exposed to or even influenced by ads is a far cry from those ads determining what the shooter would do or coercing the shooter into committing the atrocities at the Edmund Burke School. And, beyond the difference in those words, plaintiffs do not allege any facts explaining how the ads were the decisive factor in the shooter's decision to use defendants' products to try to kill people at a school or compelled him to do that. So, under the "determinative or coercive" standard, plaintiffs have failed to plead facts that would show, even if true, that their injuries are traceable to defendants' conduct.

54

The majority seems to rest its alternative holding that plaintiffs sufficiently alleged defendants' advertisements had a "determinative or coercive effect" on the shooter based primarily on our decision in *Lansdowne on the Potomac Homeowners Association, Inc. v. OpenBand at Lansdowne, LLC*, 713 F.3d 187 (4th Cir. 2013). To the majority, that case stands for the proposition that "the 'determinative or coercive effect' standard is satisfied when the defendant publishes information which leads a third party to conclude that it should proceed in a manner that injures a plaintiff." Maj. Op. at 31 (quoting *Lansdowne*, 713 F.3d at 197). But that description misses some key points about *Lansdowne*.

The case originated as a dispute between a homeowners association and OpenBand, a group of corporate entities effectively acting as a single cable service provider. *Lansdowne*, 713 F.3d at 192–95. Through a series of contractual agreements, easements and restrictive covenants, the HOA granted OpenBand the exclusive right to establish the infrastructure necessary to provide cable services. *Id.* at 193. A few years later, the Federal Communications Commission adopted a new rule outlawing these types of exclusivity arrangements. *Id.* at 192. When the HOA later attempted to find a new cable provider, competing cable companies refused to provide services to the HOA because of OpenBand's exclusivity rights, and the HOA sued OpenBand. *Id.* at 194–95. OpenBand argued that the HOA did not have standing because its injuries were caused "by the independent, intervening actions of third parties not before the court—to wit, the decisions by competing companies not to offer video service." *Id.* at 197. We rejected that argument based on evidence that the competing cable providers would have provided services to the

55

HOA but determined that they could not do so because the exclusivity arrangements prohibited them from accessing the properties and providing those services. *Id.*

Thus, the majority is correct, in a very basic sense, that the publication of the contracts, easements and restrictive covenants caused third-party cable providers to injure the HOA in *Lansdowne*. But it wasn't just the publication of those documents that caused the HOA's injury—it was the fact that those documents necessarily resulted in legal and practical hindrances preventing the third-party cable providers from servicing the HOA. In contrast, even if plaintiffs' allegations did not suffer from the problems I already described, defendants' advertisements did not affect the shooter's actions in the same legal and practical ways as the documents in *Lansdowne*. Consequently, plaintiffs have failed to allege defendants' actions had a "determinative or coercive effect" on the shooter under our precedent.

**2.**

In addition, there are other reasons plaintiffs' claims fail that do not depend on applying the "determinative or coercive effect" standard. As already described, the Supreme Court has told us that, regardless of how the standard is labeled, when there is an independent actor in between the challenged conduct of defendants and the alleged injuries, plaintiffs face a formidable challenge. *California*, 593 U.S. at 675. And in facing that challenge, speculation or guesswork about how a defendant's actions impact a third party will not do. *Diamond Alt. Energy*, 606 U.S. at 112; *Murthy*, 603 U.S. at 57. For at least

four reasons, plaintiffs have alleged no facts, beyond speculation and guesswork, that if true would trace their injuries to defendants' advertisements.

First, many of plaintiffs' allegations are conclusory. For example, plaintiffs alleged "these manufacturers have deceptively and unfairly marketed their assault rifles, rifle accessories, and ammunition in ways designed to appeal to the impulsive, risk-taking tendencies of civilian adolescent and post-adolescent males." J.A. 30. Also, plaintiffs alleged that "these consumers foreseeably use Defendants' assault rifles, rifle accessories, and ammunition in mass shootings." J.A. 30. Without additional details, allegations that marketing is unfair and deceptive, that it is designed to appeal to impulsive young men and that use of defendants' legal products in mass shootings is foreseeable are the precise types of legal conclusions and naked factual assertions we are to disregard at this stage in the litigation.[3] *See David*, 704 F.3d at 333; *see also Spokeo*, 578 U.S. at 338.

Second, plaintiffs alleged no facts tying the specific individual who opened fire at the Edmund Burke School to defendants' advertisements. For example, while they included

---

[3] The district court rejected many of plaintiffs' factual allegations because they were pled "upon information and belief." J.A. 331. The majority makes much of this fact and finds that this was an error in the district court's decision. According to the majority, "the district court's mystifying rejection of 'information and belief pleading'" was in error because that practice is allowed "when the allegations are based 'on sufficient factual material that makes the inference of culpability plausible.'" Maj. Op. at 34 (quoting *Ahern Rentals, Inc. v. EquipmentShare.com, Inc.*, 59 F.4th 948, 954 (8th Cir. 2023)). This was also the standard employed by the district court. *See* J.A. 331 ("[A]llegations pled upon information and belief 'may not be wholly conclusory.'" (quoting *Kashdan v. George Mason Univ.*, 70 F.4th 694, 701 (4th Cir. 2023)). In other words, the district court used the exact standard that the majority says it should have used. Applying it, the district court simply found that plaintiffs allegations were conclusory. To me, that was correct.

35 pages of images of defendants' online ads, plaintiffs never alleged that the shooter saw any of them. Also, it is true that plaintiffs alleged generally that the shooter had an online presence, that he had a Wikipedia page and that he called himself "an AR-15 aficionado" on that webpage. J.A. 80. But casting aside their speculative and conclusory allegations, plaintiffs did not allege the shooter ever visited any of defendants' websites. Nor did they even allege that he made online purchases of any of the products he used to carry out this tragedy. Nor did they allege how the ads, even if seen by the shooter, convinced him to not only buy the products but also use them to try to kill people at a school. Without facts that allege a connection between defendants' advertisements and the shooter's crimes, plaintiffs' speculation and guesswork about how defendants' actions impacted the shooter do not plausibly satisfy Article III's traceability requirement. *See, e.g.*, *Murthy*, 603 U.S. at 57–58; *Clapper*, 568 U.S. at 413.

Third, plaintiffs' own allegations undermine their arguments. For example, plaintiffs alleged that "the Shooter was exposed to and influenced by Defendants' deceptive and unfair marketing acts and practices *while researching and planning the Shooting.*" J.A. 81 (emphasis added). With this allegation, plaintiffs have created a timing problem that undermines their claim. How could the advertisements have caused him to commit the shooting if he was not influenced by the advertisements until he was already planning his crime?

Finally, some of plaintiffs' allegations sound more like an anti-gun public policy campaign than allegations in a lawsuit. For example, they alleged "[t]he Defendants

58

employ sales and marketing practices that create and feed a consumer base of young, civilian men *who keep the money rolling in* by purchasing not only the rifles, but all the deadly accessories that go with them—ammunition, optics, high-capacity magazines, silencers, and laser-aiming devices, among others." J.A. 30 (emphasis added). They also alleged that "[r]ather than behave responsibly, *Defendants stoke fear of gun regulations and encourage stockpiling after shootings to increase that demand*." J.A. 30 (emphasis added). Gun violence is a legitimate issue in our society. Having and expressing strong views in favor of gun control is certainly appropriate in the policy debate over those issues. But this is a lawsuit, not a political campaign. Political buzz words like these are not helpful. And they certainly do not assist plaintiffs' efforts to establish traceability.

To reiterate, none of these four shortcomings in plaintiffs' allegations depend on any distinction between "determinative or coercive effect" and "predictable effect." That's because plaintiffs have failed to plausibly allege defendants' advertisements had any effect on the shooter at all—whether determinative, coercive, predictable or otherwise. Thus, while I disagree with the majority's reading of *Department of Commerce*, these defects render plaintiffs' allegations insufficient under either of the alternative tests described by the majority and under the consistent admonishments from the Supreme Court against allegations that are no more than speculation and guesswork.

Additionally, plaintiffs and the majority make much of the fact that we are at the motion to dismiss stage of the case. Without discovery, plaintiffs and the majority insist plaintiffs' burden is low. I certainly agree that the burden a party faces at the motion to

59

dismiss stage is less than the burden at summary judgment and then at trial. But that does not relieve them of the obligation to allege facts plausibly giving rise to the inference of traceability. *See David*, 704 F.3d at 333; *cf. DiCocco v. Garland*, 52 F.4th 588, 592 (4th Cir. 2022) (explaining that the plaintiff's burden was "relatively modest" and finding that the plaintiff met that burden because she alleged facts showing the defendant's conduct was the but-for cause of her injuries (quoting *Bennett*, 520 U.S. at 171)).

Beyond that, it is incorrect to say that plaintiffs had no way to gather more information. True, Lowy submitted a FOIA request to the FBI, and the government objected to providing the information she sought in that FOIA case. *See* Compl. ¶ 5, *Lowy v. Fed. Bureau of Investigation*, No. 1:23-cv-0721-JMC (D.D.C. filed Mar. 16, 2023), ECF No. 1. But the information she sought was focused on the weapons, ammunition and supplies used by the shooter. *See* FOIA Request, *Lowy*, No. 1:23-cv-0721-JMC, ECF No. 1-1. While the request included general information about the shooting, it did not specifically seek the type of information that would be most relevant to plaintiffs' traceability issue, such as information on the shooter's online presence. Also, besides that FOIA case, plaintiffs had other options to gain information from defendants. They could have sued the shooter's estate and used third-party discovery on defendants to gather information. Or they could have employed investigators to find out information about the shooter.

Lastly, we do not dispense with pleading requirements when the information is hard to acquire. The Supreme Court made this evident in *Twombly*, 550 U.S. at 558–60. In that

case, a putative plaintiff class brought an antitrust case against various regional telephone service providers. *Id.* at 548–50. The Court explained that the plaintiffs' complaints could only survive the pleading stage if they set forth non-conclusory factual allegations showing that they were plausibly entitled to relief. *Id.* at 555–58. The Court justified this standard in part because without non-conclusory factual allegations, a party should not be able to force another into discovery. *Id.* at 558–60. Then, just a few years later, the Court clarified, in *Iqbal*, that the *Twombly* pleading standard was not specific to the antitrust context and, instead, applied in all civil cases. *Iqbal*, 556 U.S. at 684. In so doing, the Court reiterated the same concerns with discovery abuses that it raised in *Twombly*. It explained that Rule 8 "does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Iqbal*, 556 U.S. at 678–79. The Court also rejected the plaintiffs' argument that the pleading standards should be relaxed when only limited discovery would be needed. *Id.* at 684–86. Applying those principles here, the difficulty of obtaining discovery should make no difference in how we evaluate whether plaintiffs have plausibly pled their claims.

I would affirm the district court's dismissal for lack of standing.

## II.

Even though I would affirm the district court based on current law, I have some concerns about our modern approach to traceability, at least in a tort action where injuries are caused by a third party not before the court. But despite those concerns, and even if

plaintiffs have shown standing, I would still affirm the district court's alternative dismissal for lack of proximate cause.

I start with three concerns about our current law on standing. First, the discussion of whether plaintiffs have alleged standing, under either of the two alternative tests proposed by the majority, feels very similar to one we'd be having if we were considering a Rule 12(b)(6) motion to dismiss for failing to plausibly allege facts that show proximate clause. After all, when we focus on whether a "chain of causation" is broken by an "independent" event, *Bennett*, 520 U.S. at 169 (emphasis omitted), or even whether a defendant's actions predictably or foreseeably cause a plaintiff's injuries, *Dep't of Com*, 588 U.S. at 768, our inquiry seemingly envelops the very same concerns traditionally underlying the proximate cause analysis in tort, *see Paroline v. United States*, 572 U.S. 434, 445 (2014) ("Proximate cause is often explicated in terms of foreseeability or the scope of the risk created by the predicate conduct. A requirement of proximate cause thus serves, *inter alia*, to preclude liability in situations where the causal link between conduct and result is so attenuated that the consequence is more aptly described as mere fortuity." (citations omitted)). Thus, the law seemingly conflates Article III causation and tort proximate cause in this situation.

Second, it seems like our current law on traceability isn't entirely consistent. On the one hand, our current standards seemingly require us to apply the proximate cause analysis to questions of traceability when a plaintiff's injuries are directly caused by a third party, as I just described. And whether we evaluate Article III causation under *Bennett*'s

62

"determinative or coercive" language, *Department of Commerce*'s "predictable effect" terminology or the cases that describe the burden as high and one that eschews speculation and guesswork, the challenge plaintiffs face in these situations is apparently rigorous. But on the other hand, the Supreme Court has told us "[p]roximate causation is not a requirement of Article III standing." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 134 n.6 (2014). And we've said the standard for Article III causation is lower than the causation showing required to prevail in a tort suit. *DiCocco*, 52 F.4th at 592. I'm not sure how to square these two seemingly incongruous commands.[4]

Third, it's hard for me to see how the requirement of showing a sufficient level of causation helps establish whether we have an Article III Case or Controversy. Indeed, there is some scholarship suggesting that Article III's Case and Controversy language, as originally understood, simply required that a plaintiff must have a cause of action. Cass R.

---

[4] One way to square them is if the language about a high burden is not referring to a different legal standard. Perhaps it's instead only suggesting that, as a practical matter, showing traceability is harder when a plaintiffs' injuries are directly caused by actions of a third party not before the court. That is also the case when we think about proximate causation. For instance, imagine a car is traveling at highway speed, and a tire starts to come apart. This makes a loud noise for a mile or so, but the driver keeps going at the same speed. Then, the tire fails, the driver loses control and the vehicle crashes, injuring a passenger. The passenger sues the tire manufacturer, alleging a defective tire. To show that the allegedly defective tire caused the injuries, the passenger must overcome the fact that his injuries were more directly caused by the driver continuing down the road at highway speed and failing to control the vehicle after the tire failed. The passenger may have a more difficult time convincing a jury that it was the tire that caused the crash and not the driver. But there is no more rigorous legal standard. If this is what a higher burden means, it'd be helpful to clarify that an intervening cause complicates a plaintiff's task as a matter of fact, rather than as a matter of law.

Sunstein, *What's Standing After* Lujan*? Of Citizen Suits, "Injuries," and Article III*, 91 MICH. L. REV. 163, 168–81 (1992). According to this view, modern standing doctrine arguably developed out of interpretations of statutory requirements for bringing cases under the Administrative Procedures Act. *Id.* at 181–86; Elizabeth Magill, *Standing for the Public: A Lost History*, 95 VA. L. REV. 1131, 1160 (2009). But to the extent those requirements had purely statutory origins in administrative law, the Supreme Court shifted them to constitutional requirements for federal jurisdiction through a series of cases in the 1970s. Magill, *supra*, at 1174–82. So, perhaps our application of Article III's standing requirements to common law claims is worth revisiting.

Despite those concerns, even if plaintiffs had made the necessary showing for standing, I would still find that their claims should be dismissed. That's because, for largely the same reasons I found plaintiffs lack standing, they failed to plead facts that plausibly allege defendants' conduct proximately caused their injuries. Plaintiffs must allege proximate causation to properly allege entitlement to relief under any of their claims.[5]

---

[5] In counts 1 through 13, plaintiffs accused defendants of violating the Virginia False Advertising Statute (VFAS), Va. Code Ann. § 18.2-216. Then, in counts 14 through 26, plaintiffs alleged defendants violated the Virginia Consumer Protection Act (VCPA), Va. Code Ann. § 59.1-196 *et seq.* In count 27, plaintiffs sought to hold Daniel Defense, BCM, FosTecH, Griffin Armament, Centurion Arms and SOLGW liable for negligence per se based on their alleged violations of the National Firearms Act (NFA), 26 U.S.C. § 5801 *et seq.* In count 28, plaintiffs sought to hold this same group of defendants liable for negligence per se based on their alleged violations of Virginia's Uniform Machine Gun Act (UMGA), Va. Code Ann. § 18.2-288 *et seq.* Finally, in count 29, plaintiffs accused Daniel Defense, Magpul, FAB Manufacturing, Fiochi Munizioni, Surefire and Torkmag of negligence. Both the VFAS and the VCPA require plaintiffs to demonstrate injuries as a result of defendants' statutory violations. *See* Va Code Ann. §§ 59.1-68.3; 59.1-204. (Continued)

64

Under Virginia law, "[t]he proximate cause of an event is that act or omission which, in natural and continuing sequence, unbroken by an efficient intervening cause, produces the event, and without which that event would not have occurred." *Dorman v. State Indus., Inc.*, 787 S.E.2d 132, 138–39 (Va. 2016) (quoting *Kellermann v. McDonough*, 684 S.E.2d 786, 793 (Va. 2009)). Here, for reasons I explained previously, plaintiffs have not alleged facts that, if accepted as true, show a link between defendants' advertisements and the shooter's independent decisions to commit his crime. Thus, if the court were to reach the merits of plaintiffs' claims, their allegations would fail under Rule 12(b)(6).[6]

---

Likewise, proximate cause is an element of negligence under Virginia common law. *Al-Saray v. Furr*, 910 S.E.2d 320, 324 (Va. 2025). And to prevail on their negligence per se claim, plaintiffs must demonstrate that defendants' alleged statutory violations were proximate causes of their injuries. *Halterman v. Radisson Hotel Corp.*, 523 S.E.2d 823, 825 (Va. 2000).

[6] After ruling on standing, the district court alternatively found that plaintiffs' allegations would fail on the merits because their failure to plead proximate cause would mean their claims were barred by the Protection of Lawful Commerce in Arms Act (PLCAA), 15 U.S.C. § 7901 *et seq*. That statute prohibits a plaintiff from bringing "a civil action . . . against a manufacturer or seller of a qualified product . . . resulting from the criminal or unlawful misuse of a qualified product by the person or a third party." 15 U.S.C. §§ 7902(a); 7903(5)(A). And it defines a "qualified product" as "a firearm . . . , or ammunition . . . , or a component part of a firearm or ammunition, that has been shipped or transported in interstate or foreign commerce." *Id.* § 7903(4). Notably, there is an exception to the PLCAA's general prohibition of liability known as the "predicate exception." *Smith & Wesson Brands, Inc. v. Estados Unidos Mexicanos*, 605 U.S. 280, 286 (2025). "That exception applies to suits in which the defendant manufacturer or seller 'knowingly violated a State or Federal statute applicable to the sale or marketing' of firearms, and that 'violation was a proximate cause of the harm for which relief is sought.'" *Id.* (quoting § 7903(5)(A)(iii)). The PLCAA also includes a separate exception that permits plaintiffs to bring suits for negligence per se. § 7903(5)(A)(ii). Thus, because proximate cause is relevant to these exceptions under the PLCAA, it is, by extension, relevant to whether the PLCAA immunizes defendants from liability. I take no position at this time on (Continued)

And if we step back from the emotion of a school shooting, this result should not come as any surprise. If plaintiffs' theory were viable, think of where it might lead. Imagine a disturbed individual buys a car marketed as having a powerful engine that permits quick acceleration. The individual then takes that vehicle and accelerates into a crowd, killing and injuring many in its path. Would the vehicle manufacturer be liable to victims because of ads stating that the car could go from 0 to 60 in seconds? Of course not. Nor have these plaintiffs asserted a viable claim against these defendants.

### III.

Finally, before closing, I want to address the majority's conclusion that it was improper for the district court to reach the merits of plaintiffs' claims after determining it lacked jurisdiction. Relying primarily on the Supreme Court's decisions in *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83 (1998), and *Ex parte McCardle*, 74 U.S. (7 Wall.) 506 (1868), the majority reasons that, once the district court found that it lacked Article III jurisdiction, it had to put down its pen. According to the majority, the district court had no authority to alternatively consider whether plaintiffs' allegations failed on the merits. I do not read those cases to require such restraint.

Certainly, it is true that courts must have Article III jurisdiction to act. *See Steel Co.*, 523 U.S. at 94; *McCardle*, 74 U.S. (7 Wall.) at 514. It is also true that in *Steel Co.*, the

---

whether the PLCAA applies to plaintiffs' allegations against these defendants. But I note that, if it does apply, plaintiffs' failure to plead proximate cause would also mean plaintiffs are not entitled to either of these exceptions to immunity under the PLCAA. *See* § 7903(5)(A)(ii), (iii).

66

Court rejected the doctrine of "hypothetical jurisdiction." 523 U.S. at 94, 101. Under that doctrine, a court faced with a tough jurisdictional question and an easy merits question might assume the existence of jurisdiction and dismiss the case on the merits. *Id.* at 94. The Supreme Court made clear courts cannot do that because jurisdiction "is always an antecedent question." *Id.* at 101. Thus, a court cannot base its ruling on the merits when there is an open question about whether it has jurisdiction. *Id*. at 101–02.

Therefore, it is clear from *Steel Co.* that a federal court faced with jurisdictional questions cannot assume hypothetical jurisdiction and skip over those issues straight to the merits. *See id.* at 93–102. Or, as the majority puts it, "a federal court cannot assume that Article III's jurisdictional requirements are satisfied, simply to reach the merits of an 'interesting . . . issue.'" Maj. Op. at 38 (quoting *Palmer v. Liberty Univ.*, 72 F.4th 52, 68 n.8 (4th Cir. 2023)). But that is not what happened here. Rather than assuming jurisdiction, the district court engaged in a thoughtful and thorough analysis of this complicated question. Then, only after fully engaging with those issues, and determining that it lacked jurisdiction, did the district court render the alternative holding that the same defects making plaintiffs' complaints insufficient to properly allege standing—namely, lack of causation—also doomed their claims on the merits.

Courts, including ours, routinely issue alternative holdings. *See, e.g.*, *United States v. Hunt*, 123 F.4th 697, 702 (4th Cir. 2024) ("Second—and in the alternative—we conclude that Section 922(g)(1) would pass constitutional muster even if we were unconstrained by circuit precedent."). And we routinely affirm district courts' alternative holdings. *See, e.g.*,

67

*Foodbuy, LLC v. Gregory Packaging, Inc.*, 987 F.3d 102, 120 (4th Cir. 2021). Notably, we have even affirmed a district court's alternative holding after finding the district court erred in dismissing an action for lack of subject-matter jurisdiction. *See Food Town Stores, Inc. v. E.E.O.C.*, 708 F.2d 920, 923–25 (4th Cir. 1983); *see also Protopapas v. Travelers Cas. & Sur. Co.*, 94 F.4th 351, 358–59 (4th Cir. 2024) (dismissing an appeal of a remand order based on both the district court's subject-matter-jurisdiction ruling and its alternative procedural-defect ruling). Thus, I do not read Supreme Court precedent as restraining the district court from issuing its alternative holding.[7]

Making matters worse, after explaining its view that the district court should not have issued its alternative holding, the majority, once again relying on Second Circuit precedent, seems to conclude that we lack authority to review that alternative holding. According to the majority, since the district court decided it lacked jurisdiction, it did not have power to expound on those grounds. And even though the majority concludes the court did, in fact, have jurisdiction, we still must turn a blind eye to the alternative reason the district court said warranted dismissal. The majority's reasoning can be summarized as "a district court which erroneously concludes that it lacks jurisdiction does lack jurisdiction even if it does not really lack jurisdiction." *Rutherford v. McDonough*, 466 F.3d 970, 976 (11th Cir. 2006). This makes no sense to me. And it conflicts with those previous instances in which we have reviewed alternative holdings district courts issued after first determining

---

[7] Maybe one could argue that the district court's alternative holding would be dicta. But that does not mean it was improper for the district court to include its alternative reasoning.

they lacked jurisdiction. *See Food Town Stores*, 708 F.2d at 923–25; *Protopapas*, 94 F.4th at 358–59.

For these reasons, I see nothing wrong with the district court reaching an alternative ground for dismissal after first addressing the jurisdictional issues. And, if I agreed with the majority that the district court erred in its jurisdictional assessment, I would see nothing wrong with affirming dismissal of most defendants on the basis of the district court's alternative holding.[8]

## IV.

My heart hurts when I consider the facts of this case. What makes a young man open fire on a school? Isn't there something we can do to stop these horrible and senseless acts of gun violence? But neither the pain of recounting this attack nor the understandable questions that it raises permit us to look away from or water down the law's requirements that plaintiffs plead facts that, if true, show their injuries are traceable to defendants' conduct or that defendants proximately caused this horrific event. Stripped of conclusory statements and speculation, plaintiffs did not do this. We should affirm the district court.

---

[8] Vista Outdoors, Fiocchi of America, FAB Manufacturing and Fiocchi Munizioni all argued in their respective motions to dismiss below that the court lacked personal jurisdiction over them. Like subject-matter jurisdiction, personal jurisdiction must be addressed before the court rules on the merits. *See Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 584–85 (1999). Thus, if I believed there was standing, I would remand for the district court to address the personal jurisdiction issues against these defendants and affirm dismissal of the allegations against all other defendants.

69